JOHN W. GREEN AND DOLORES MARIA GREEN, PLAINTIFFS-APPELLANTS, v. STERLING EXTRUDER CORPORATION, TRANSOGRAM MIDWEST, INC. AND JOHN DOE, DEFENDANTS, AND TRANSOGRAM CO., INC., DEFENDANT-RESPONDENT.

Argued January 9, 1984—Decided February 8, 1984.

*Karl Asch* argued the cause for appellants (*Karl Asch,* attorney; *Karl Asch* and *Ronald S. Suss,* on the briefs).

*Herbert C. Klein* argued the cause for respondent (*Klein, Chapman, Di Ianni, Henkoff & Siegel,* attorneys; *Herbert C. Klein* and *Andrew S. Kessler,* on the briefs).

The opinion of the Court was delivered by

CLIFFORD, J.

Under the current state of our law in the strict liability context, contributory negligence in any of its varied forms (excluding, of course, any intentional or willful act) will not foreclose a factory worker who is injured while using a defective machine for a reasonably foreseeable purpose from recovering against the machine's manufacturer. *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 177 (1979). Nor may such negligence of the worker serve to reduce any award in his favor under principles of comparative negligence, *N.J.S.A.* 2A:15–5.1. See *Suter, supra,* 81 *N.J.* at 177. The question posed by this appeal is whether a factory worker's contributory fault [1] may be similarly disregarded in an action grounded solely in negligence.

[1] Dean Prosser prefers the term "contributory fault" to "contributory negligence." He suggests that the phrase "contributory negligence" is a misno-

The Appellate Division, in an unreported opinion, held that in the stated circumstances the worker's contributory fault was available to the machine manufacturer as a defense. We disagree. Because it found error, however, on a point we do not reach, the court below remanded the cause for a new trial on liability. We reverse and order judgment for plaintiff on the liability phase of this bifurcated case.

I

Plaintiff John Green [2] brought suit on account of personal injuries sustained in January, 1977, while he was employed by Merlin Manufacturing Corporation (Merlin). He had been working for Merlin intermittently for about a year as a foreman, supervisor, and set-up man. On the date in question Green was working on a plastic blowmolding machine that, as the jury found, had originally been designed and assembled by defendant Transogram Co., Inc. (Transogram), for its own use but was subsequently acquired by Merlin after a bankruptcy sale of defendant's machines. The other named defendants are no longer involved in the case.

The blowmolding machine was used for the manufacture of plastic toys. It consisted of three separate components connected electrically and hydraulically: a tube called an extruder, used to heat plastic pellets and melt them down into a tube-like shape; a blow press, used to mold the plastic tube into the configuration of the toy mold; and a hydraulic system and

mer, since "[n]egligence as it is commonly understood is conduct which creates an undue risk of harm to others," while so-called "contributory negligence is conduct which involves an undue risk of harm to the actor himself." *W. Prosser, Torts* § 65, at 418 (4th ed. 1971); *see also Ettin v. Ava Truck Leasing, Inc.*, 53 *N.J.* 463, 472 (1969) ("[T]hough we consider it hardly necessary, the term 'contributory fault' could, if so desired, readily be substituted for the term 'contributory negligence'.")

[2] Plaintiff Delores Maria Green is plaintiff John Green's wife. Her claim is for loss of consortium. As used in this opinion "plaintiff" refers to plaintiff John Green.

timing mechanism, used to supply power to and coordinate the operations of the other two parts. A button on the left side of the press mechanism shut off the power. The machine was not equipped with an interlocking guard, available at the time of manufacture, that would have prevented workers from placing their hands in the press area while the machine was in operation, nor did it bear any warnings about the danger of reaching between the presses while the power was on.

In the operation of a blowmolding machine the "set-up man" inserts a hollow mold of a particular shape and size between the two presses, one half on the inside wall of each press. Plastic pellets are then poured into the top of the extruder. The extruder heats the plastic, melts it down, and ejects it through the bottom in the form of a hot plastic tube or "parison." As the parison descends from the extruder into the area between the two die presses, the presses automatically clamp together on it at a force of 2,000 pounds per square inch, or a total closing force of 20 tons. This forces the parison into the mold between the presses. Hot air is then injected into the parison through a needle alongside one of the presses, and the plastic is blown up to the configuration of the mold. Finally, the plates separate, allowing the "machine operator" to remove the completed toy from the mold. As we understand the plaintiff's testimony this entire heating, melting, and molding process takes about sixteen to twenty seconds.

Blowmolding machines do not always work as smoothly as the foregoing description might suggest, however. Dribbles of plastic from the parison occasionally become caught on the alignment pins alongside the molds or elsewhere inside the die presses. At such times, as part of the normal operation of the machine, the machine operator must reach between the die presses to unjam the machine so that the operation can be completed.

At the time of the accident plaintiff, a 37-year-old man with a ninth-grade education who had been doing "set-up work" for

various companies for about ten years, was relieving a machine operator who was on her lunch or coffee break. He had performed this task several times previously, resulting in his familiarity with the machine's operation. The machine was making plastic toy baseballs and bats. At about one or two o'clock, Green observed a piece of plastic stuck on an alignment pin alongside the mold. He reached inside to remove the obstruction and the presses "slammed shut," in his words, "[j]ust about instantly." The fingers of his right hand were crushed.

Plaintiff's supervisor claimed that standard company procedure was to use the "stop" button on the left side of the press to deactivate the machine before removing plastic from between the dies. However, there was no evidence that employees were routinely advised of such a procedure—for example, in a job manual or orientation session—and it was not established that Green's fellow employees followed this procedure themselves. It is also unclear how frequently and how quickly the presses normally closed. Green himself testified that even though he was "certainly" aware that the die presses would hurt him if they were to slam shut while his hand was inside, he had never been warned of any dangers involved in reaching inside the mechanism, and did not think that the die presses could actually close on his hand.

Although the blowmolding machine had been disassembled and reassembled several times between the manufacture and the accident, it apparently was unchanged in at least this respect: it had never been equipped with any sort of protective guard surrounding the press area or with an interlock system that would deactivate the machine whenever a worker removed the guard to clean or unclog the press. An engineer and accident inspector who examined the machine after the accident and who testified on plaintiff's behalf said at trial that the machine "could [not] be safely operated by a worker in the plant" without such a protective enclosure. He claimed that interlocking guard systems had been in use since the turn of the century, were in use specifically in the plastics industry for some time

before 1960, and could feasibly have been installed by the manufacturer without interfering with the utility or speed of the blowmolding machine. He further testified that it was fully foreseeable in 1960 that blowmolding machine operators, while operating the machine, would occasionally need to remove obstructions from between the presses and that the need for an interlocking guard should thus have been apparent to the machine's designers. This evidence was uncontroverted; there was no expert testimony for the defense.

Plaintiff's suit proceeded on theories of strict liability and negligence. To aid the jury in its deliberations the trial court posed certain interrogatories. By its unanimous answers the jury found that the machine on which plaintiff was injured was designed and assembled by defendant Transogram and subsequently sold by it to plaintiff's employer; that plaintiff was using the machine for its intended or reasonably foreseeable purpose; and that the improper design and assembly of the machine were a proximate cause of plaintiff's injuries. The jury also unanimously determined that defendant Transogram was negligent in selling a machine that it should have foreseen might injure a person using it for the purpose for which intended, but that 75% of the combined negligence of both parties was attributable to plaintiff and 25% to defendant. In an opinion written after receiving the jury's special verdict, R. 4:39–1, the trial court concluded that Transogram could not be held liable to plaintiff in strict liability because that defendant was not engaged in the business of selling machines and the blowmolding machine in question was not sold in the ordinary course of defendant's business but was sold at a court-ordered auction. Therefore, on a comparative negligence basis, the court molded a judgment in favor of defendant, plaintiff's contributory fault having exceeded that of defendant. See *N.J.S.A.* 2A:15–5.2c.

The Appellate Division agreed with the trial court's determination that under the facts of this case defendant was not accountable as a manufacturer of the machine on principles of strict liability. The court below concluded that there was insuf-

ficient evidence to demonstrate what it perceived to be an indispensable ingredient in the strict liability equation, namely, that Transogram was engaged in the business of selling a product; it held that the sale of the machine in question at a bankruptcy auction could not be viewed "as a sale by a machine manufacturer in the ordinary course of business." Because plaintiff did not seek review of that holding, we do not address the provocative issue it contains, and no conclusion as to how we would resolve it were we to confront the question should be drawn from our silence.

The court below then considered the application of comparative negligence principles to the negligence claim. It recognized that the contributory negligence defense would be unavailable to a manufacturer of an inadequately guarded industrial machine that was sued on a strict product liability claim, and acknowledged that "[i]n such a case, we see no difference between the product liability claim and the negligence claim * * *." Nevertheless, the Appellate Division concluded that "absent a basis for strict liability, * * * ordinary principles of comparative negligence [should] apply in determining liability on the negligence cause of action exclusively." However, the court remanded the case for a new trial because it determined that in his cross-examination defense counsel had improperly suggested, "without specific proof * * * that Green's prior history of alcoholism * * * affected his operation of the machine on the day in question" and that "this line of cross-examination * * * had a strong capacity for contributing to the jury's evaluation of the respective degrees of [the parties'] negligence * * *."

Plaintiff petitioned this Court for certification on a single issue, namely, "whether, absent a basis for strict liability, comparative negligence should be applied in determining liability [on a negligence count] in a design defect case." Defendant cross-petitioned on the question of whether its cross-examination of plaintiff required a new trial. We granted both the petition and cross-petition, 94 *N.J.* 594 (1983).

## II

When last this Court came to grips with the question of the impact of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3, in strict liability actions, it held that an employee engaged at his assigned task on a plant machine could not be barred, nor suffer the reduction of any favorable verdict, by his contributory fault—this as a matter of policy, and "[i]rrespective of the rationale that the employee may have unreasonably and voluntarily encountered a known risk * * *." *Suter, supra,* 81 *N.J.* at 167. The minority in *Suter* would have retained the defensive thrust of contributory fault in a strict liability setting, but in only a limited range of plaintiff's conduct: not in the sense of mere carelessness or inadvertence, but in respect of conduct by which plaintiff voluntarily and unreasonably proceeds to encounter a danger known to him—the formulation found in Comment n of the *Restatement (Second) of Torts* § 402A (1965). *Suter, supra,* 81 *N.J.* at 192–207 (concurring opinion).

Although the Court remains not of one mind on the issue that divided us in *Suter,* this appeal is hardly an appropriate vehicle for the rehashing of that question. We need not even count heads on it or display our ardor for, or aversion to, the respective contesting viewpoints, for it is abundantly clear to all of us that no matter where one stands on the *Suter* contributory fault question, plaintiff's conduct here amounted to no more than ordinary carelessness. No member of the Court would permit that kind of conduct to bar or reduce a worker's strict liability claim in the employment circumstances presented. As the comprehensive recitation of facts in Part I of this opinion demonstrates, there is no suggestion of unreasonable or voluntary exposure to a known risk explicit or implicit in plaintiff's actions. Therefore, even those who would side with the minority view in *Suter* are satisfied that its test has not been met in this case.

■ That brings us to the issue we certified on plaintiff's petition: whether, given the employment environment that would foreclose a contributory fault defense were the claim one in strict liability, the same result should obtain when, as here, the injured worker's suit sounds in negligence. The result is surely foreshadowed by this Court's observation in *Bexiga v. Havir Mfg. Corp.*, 60 *N.J.* 402 (1972):

> Contributory negligence may be a defense to a strict liability action as well as to a negligence action. However, in negligence cases the defense has been held to be unavailable where considerations of policy and justice dictate. * * * [T]his Court [has also] said that undoubtedly this defense will be unavailable in special situations within the strict liability field. We think this case presents a situation *where the interests of justice dictate that contributory negligence be unavailable as a defense to either the negligence or strict liability claims.*
>
> The asserted negligence of plaintiff—placing his hand under the ram while at the same time depressing the foot pedal—was the very eventuality the safety devices were designed to guard against. It would be anomalous to hold that defendant has a duty to install safety devices but that a breach of that duty results in no liability for the very injury the duty was meant to protect against. [60 *N.J.* at 412 (citations omitted, emphasis added).]

The policy reasons supporting the *Bexiga* principle are clear. A factory worker pursuing his assigned task on a plant machine has no real choice. The practicalities of the workaday world are such that in the vast majority of cases, the employee works "as is" or he is without a job. *Bexiga,* then, carved out a "special circumstance"—that of the factory worker injured while using an unsafe machine for its intended purpose—in which public policy demanded that the manufacturer be deprived of any contributory negligence defense. As has been indicated, a unanimous Court continues to endorse, at least to the extent implicated by the worker's ordinary negligence, that principle, embraced by every member of the Court in *Cepeda v. Cumberland Eng'g Co., Inc.,* 76 *N.J.* 152 (1978), as well as in *Suter, supra,* 81 *N.J.* 150.

We fail to see any reason of policy or elemental justice why the selfsame principle should not be applicable in the situation before us. The fact that plaintiff's claim is grounded in negligence rather than in strict liability does not bear on any of the

considerations that generated the principle in the first place. Contributory negligence would serve to excuse the very conduct that gives rise to strict liability on the part of the manufacturer. Precisely the same is true of the manufacturer's liability in negligence.

Plaintiff, Green, was employed in a factory setting similar to that of the injured workers in *Bexiga, Cepeda,* and *Suter.* The jury determined that he was using the machine for its intended or reasonably foreseeable purpose and was injured because of that machine's improper design and assembly. Defendant's negligence, now fixed by specific findings of the jury, lay in selling a machine the inadequately guarded nature of which it should have foreseen might cause injury to one in the position of this plaintiff. As one writer, commenting approvingly on *Bexiga,* has said, "[o]nce it is established that the defendant has a duty to protect persons from the consequences of their own foreseeable faulty conduct, it makes no sense to deny recovery because of the nature of the plaintiff's conduct." Marschall, "An Obvious Wrong Does Not Make a Right: Manufacturers' Liability for Patently Dangerous Products," 48 *N.Y.U. Law Rev.* 1065, 1088 (1973). Although, as explained earlier in this opinion, *supra* at 269–271, some members would impose limitations on that proposition, we nevertheless are unanimous in our agreement as to its application here.

## III

Because we have concluded that defendant does not, in the circumstances of this case, have available any defense predicated on plaintiff's contributory fault, we do not reach the issue, certified on defendant's cross-petition, of the propriety of the cross-examination of plaintiff.

The jury has already determined that defendant's negligence was a proximate cause of plaintiff's injuries, a determination that has not been challenged on this appeal. The issue of contributory negligence should not have been submitted to the

jury and its finding on that question must therefore be disregarded.

The judgment of the Appellate Division is reversed. The cause is remanded to the Law Division for entry there of a judgment in favor of plaintiffs on the liability issue. The case may be listed for trial on the issue of damages.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN, GARIBALDI—7.

*For affirmance*—None.