256 N.J. Super. 467 (1992)
607 A.2d 667
CARLOS RAMOS, PLAINTIFF-APPELLANT
v.
SILENT HOIST AND CRANE CO., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 11, 1992.
Decided May 12, 1992.
*470 Before Judges DREIER, GRUCCIO and BROCHIN.
Hugh M. Turk argued the cause for appellant (Sullivan & Liapakis, attorneys; Hugh Turk on the brief).
Andrew Carlowicz, argued the cause for respondent Foremost Electric (Hoagland, Longo, Oropollo & Moran, attorneys; James B. Moran, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiff appeals by leave granted from an interlocutory order determining that defendant Foremost Electro-Service Co. was neither a manufacturer nor seller within the meaning of the 1987 Product Liability Act, N.J.S.A. 2A:58C-1 et seq., and that plaintiff's claim against Foremost could only be founded on *471 the theory of negligence to which a defense of comparative negligence would be applicable. The matter had been partially tried before a different judge who determined to bar the comparative negligence defense. That trial ended in a mistrial. We here explore (1) the meaning of the terms "manufacturer or seller" as used in N.J.S.A. 2A:58C-2, and (2) the limited application of comparative negligence in a workplace injury setting.

I  The Facts

Plaintiff Carlos Ramos, then 20 years old, was injured on September 10, 1986 while attempting to tie a line from a docking tanker to a capstan at the Linden terminal dock owned by his employer, Citgo Petroleum Corporation. The capstan was installed in 1974 by defendant Silent Hoist & Crane Co., which along with the owners of the tanker, have settled with plaintiff, leaving Foremost as the sole defendant. The capstan was installed by Silent Hoist and was equipped with an electric motor so that it could rotate after a line was secured to one of its horizontal posts.
Citgo's predecessor, Cities Service Oil Co., determined not to have Silent Hoist provide the electricity to the capstan, but rather to have Foremost, an electrical contracting company which Cities Service maintained on retainer, run the electric line to the capstan and provide the controls. Foremost was under an annual contract "to supply labor, material and equipment to provide inspection, repairs, maintenance and wiring on all electric equipment as requested by Cities Service Oil Company, Linden, New Jersey Terminal." The invoice from Foremost to Cities Service dated August 30, 1975 shows that from August 7 to August 20 Foremost had installed the conduit for new winches at the dock, mounted the "motor, starter and stop-start station" for the winch and made all connections, both for the winch that caused plaintiff's injuries and a second winch at the north end of the dock. There is no dispute that Foremost chose the location of the switch and to this extent designed the *472 electrical system connecting the motorized winch to a power source.[1] The total charge for labor and material was $1,870.46.
On the day of the accident, a crew member of the Netherlands tanker Jo Birk, about to dock at the Citgo pier, indicated to plaintiff by hand motions that he should tie a messenger line (a one inch line which is used to draw in a four inch docking hawser) to the capstan. The messenger line was to be drawn in by the rotating capstan, after which the hawser would be attached to a large dock-side cleat, whereupon an on-board winch would bring the ship against the dock. Ordinarily, a four-man docking crew would perform this maneuver on the Citgo dock.[2] The docking crew was not there, and plaintiff assumed, apparently incorrectly, that since he was at the location he should perform this service, although it was not part of his regular job.
Plaintiff walked over to the on-off switch located approximately ten feet from the capstan and turned on the power. He then returned to the capstan and attached one end of the messenger line to the rotating capstan, causing the messenger line to begin to be wrapped around the capstan, and creating a pinch-point between the incoming line and the capstan surface. There was no guard on the capstan, and plaintiff's hand became caught in the pinch-point drawing the rest of his body into the area between the line and the surface of the capstan. Since the controls were far away and the capstan as originally manufactured provided for no emergency safety switch on the capstan *473 or itself within reach of it, plaintiff could not stop the rotation of the capstan. The messenger line wrapped around plaintiff's body causing multiple fractures and other substantial injuries, requiring the eventual amputation of his leg.

II  Duties of Manufacturer or Servicer

Plaintiff contends that Foremost, as the designer and installer of the electrical connections to the rotating capstan, is a "manufacturer or seller of a product" within the meaning of N.J.S.A. 2A:58C-2. Foremost asserts that it merely provided the service of designing and installing electric wiring and a switch, and thus it falls outside of the ambit of the statute. Although the parties belatedly came to realize that this action could be controlled by the Product Liability Act, the issue was distinctly framed before the trial judge who held that Foremost was not a "manufacturer or seller," and thus plaintiff was relegated to his negligence claims against Foremost.
In this case there is a fine line separating the designations of a seller or manufacturer as opposed to a supplier of a service. But, as we will demonstrate, in this case such designations provide a distinction without a difference.
As we noted in Tirrell v. Navistar Int'l., Inc., 248 N.J. Super. 390, 398, 591 A.2d 643 (App.Div. 1991), certif. denied, 126 N.J. 390, 599 A.2d 166 (1991), the Legislature has consolidated the negligence, breach of warranty and strict liability theories for product liability claims into a single "product liability action" under N.J.S.A. 2A:58C-1 et seq. We there stated:
Since a product liability action encompasses "any claim or action brought by a claimant for harm caused by a product," N.J.S.A. 2A:58C-1, (emphasis added), and section 2 describes the sole method of proof, namely that recognized for strict liability claims, it is clear that common-law actions for negligence or breach of warranties (except express warranties) are subsumed within the new statutory cause of action, if a claimant and harm also fall within the definitional limitations of section 1.
Id. at 398, 591 A.2d 643 (footnote omitted). We also noted that N.J.S.A. 2A:58C-1a "states that the `sponsors or committee statements ... adopted or included in the legislative history of *474 this act shall be consulted in the interpretation and construction of this act.'" Id. at 398, n. 5, 591 A.2d 643.
The Senate Judiciary Committee Statement sheds light on the question of whether the Legislature intended to change the preexisting law concerning the status of a manufacturer or seller:
The provisions of sections 2 through 4 are not intended to codify all issues relating to product liability, but only to deal with matters that require clarification....
Section 2 identifies the theories under which a manufacturer or seller may be held liable for harm caused by a product.... Except as modified by the provisions of section 3 and 4, the elements of these causes of actions are to be determined according to the existing common law of the State.[3] (emphasis added).
N.J.S.A. 2A:58C-1, Senate Judiciary Committee Statement.
We will examine Foremost's activities to determine whether it would have been considered a manufacturer or seller *475 prior to the Product Liability Act. We start with the proposition that negligence in installing a particular piece of equipment has a different basis of liability than strict liability for the sale of the equipment itself. See Cartel Capital Corp. v. Fireco of N.J., 81 N.J. 548, 563-565, 410 A.2d 674 (1980). In Cartel Capital, defendant Fireco of New Jersey was both the seller of the defective fire extinguisher, and thus subject to a strict liability claim, and was also the installer which negligently assembled the unit. The Supreme Court recognized that these were separate claims and that both could be pursued through judgment, although only one execution could be secured. In Lally v. Printing Mach. Sales & Serv. Co., Inc., 240 N.J. Super. 181, 572 A.2d 1187 (App.Div. 1990), we elaborated upon the distinction between a negligence claim involving the supplying of services and duties which devolve upon a reconditioner or manufacturer. Id. at 184-187, 572 A.2d 1187.
We are here required to determine whether strict liability should be imposed upon Foremost which determined where to place the control switch on another's product and had installed it as part of an overall servicing agreement. Not all transactions involving labor and materials support the imposition of strict liability. For example, we have previously held that an occasional seller of discarded equipment should not be subject to strict liability. Santiago v. E.W. Bliss Div., 201 N.J. Super. 205, 216-217, 492 A.2d 1089 (App.Div. 1985); see also Allen v. Nicole, Inc., 172 N.J. Super. 442, 412 A.2d 824 (Law Div. 1980). But cf. Green v. Sterling Extruder Corp., 95 N.J. 263, 268-269, 471 A.2d 15, 18 (1984) (where liability for a sale other than "by a machine manufacturer in the ordinary course of business" was expressly left open.)
*476 In Michalko v. Cooke Color & Chem. Corp., supra, the Supreme Court stated:
[W]hen it is feasible for ... the manufacturer of component parts to incorporate a safety device and it fails to do so, the ... component part will be deemed to be a defective product when delivered by the manufacturer to its owner. Further, the fact that the product was built according to the plans and specifications of the owner does not constitute a defense to a claim based on strict liability for the manufacture of a defective product when the injuries are suffered by an innocent foreseeable user of the product.
91 N.J. at 395, 451 A.2d 179. The Court further stated that "the manufacturer of a component part of a product may be held strictly liable for injuries caused by a defect in that part if the particular part did not undergo substantial change after leaving the manufacturer's hands." Id. at 399, 451 A.2d 179. In Michalko and similar safety device cases, however, the principal activity of the defendant was the creation or change of the product. Here, the principal activity of defendant was the installation of another's product.
While we acknowledge that the question is a close one, we determine that Foremost's design of the electrical system and its professional choice of where to place the controls (when the manufacturer of the capstan had made no provision for controls on or near the capstan nor advised the installer in this respect), is not the same as a sale of a defectively designed component part of the assembled capstan. Cf. Board of Trustees of Union College v. Kennerly, Slomanson & Smith, 167 N.J. Super. 311, 317, 400 A.2d 850 (Law Div. 1979). If the switch itself had been defective and a person had been consequently injured by reason of an electrical shock, Foremost might well have been liable for the statutory claim; but that is not what happened here. Foremost designed and installed an electrical system to power the capstan. It may have done so negligently, but it did not, in the sense of the Michalko discussions, provide a defective component part. As we noted in Lally v. Printing Machinery Sales, supra, "[i]t would be highly unfair if an auto mechanic who changes a flat tire, thus enabling an incapacitated automobile to be used, becomes responsible *477 for warning of the lack of all safety devices relating to the wheel on which he was working, or even to the car as a whole." 240 N.J. Super. at 186-187, 572 A.2d 1187. Similarly, even though his actions permitted the vehicle to be operable, such a mechanic would not be responsible for design defects in the car, even if he installed the new tire in a negligent manner. He might, however, be responsible for his negligence, to be considered as joint responsibility with the strictly liable manufacturer of the wheel assembly or car.
On a more practical basis, we cannot lose sight of the insurance ramifications of our decision. If this electrician had no product liability coverage, and there is no reason it would have such coverage, our defining its actions as the sale of a defective product could have been financially disastrous. The effect would be felt not just in this case, but throughout the service industries, affecting plumbers, carpenters, and other trades. The law should follow the reasonable expectations of the public concerning the ramifications of a party's actions.
While we have relegated Foremost's conduct to the service side of the service/product division line, when we are faced with a workplace injury this conclusion may not affect Foremost's liability. In a case such as this, there is virtually no difference between a design defect and a negligence basis for liability. As the Supreme Court stated in Feldman v. Lederle Labs., 97 N.J. 429, 479 A.2d 374 (1984):
When the strict liability defect consists of an improper design or warning, reasonableness of the defendant's conduct is a factor in determining liability.... The question in strict liability design-defect and warning cases is whether, assuming that the manufacturer knew of the defect in the product, he acted in a reasonably prudent manner in marketing the product or providing the warnings given. Thus, once the defendant's knowledge of the defect is imputed, strict liability analysis becomes almost identical to negligence analysis in its focus on the reasonableness of the defendant's conduct. In Cepeda [v. Cumberland Eng'g Co.], supra, 76 N.J. [152] at 172 [, 386 A.2d 816 (1978)], and Suter [v. San Angelo Foundry & Mach. Co.], supra, 81 N.J. [150] at 171 [, 406 A.2d 140 (1979)], we quoted approvingly Prosser's treatise on torts: "since proper design is a matter of reasonable fitness, the strict liability adds little or nothing to negligence on the part of the manufacturer * * *." W. Prosser, Law of Torts, 659 n. 72 (4th Ed. 1971).
*478 97 N.J. at 451, 479 A.2d 374. This similarity of a design claim to a negligence claim was reiterated in Fischer v. Johns-Manville Corp., 103 N.J. 643, 655, 658-659, 512 A.2d 466 (1986). See also Sheila L. Birnbaum, "Unmasking The Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence," 33 Vand.L.Rev. 593, 618, 627 (1980).
In this case Foremost's liability should not depend upon whether Foremost is called a manufacturer or seller who created a design defect, or whether Foremost is called a servicing electrician who negligently designed the system. Foremost's action produced the same result irrespective of its legal label. If it negligently placed the switch, or designed a defective (unsafe) control, plaintiff was faced with the identical problem. In the negligence setting, Foremost had a duty to protect "against unreasonable risk of harm." Prosser & Keaton on Torts, § 31 p. 170 (5th Ed. 1984). In the product liability setting, Foremost would have had a duty to design the system so that it was reasonably safe. Is there really a difference between such duties? We think not. Even under the Product Liability Act, N.J.S.A. 2A:58C-2, Foremost would have been responsible only if "the product ... was not reasonably fit, suitable or safe for its intended purpose because it: ... (c) was designed in a defective manner." In short, irrespective of the label attached to its duty, Foremost would be held to a standard of reasonableness in its design.

III  Effect of Plaintiff Negligence

Of course, depending upon whether the case involves a workplace injury or a product, or both, the comparative fault of plaintiff which a court may consider may be different in a strict liability case from a negligence case. In the workplace setting, where the plaintiff encounters the risk as a part of his activities, his comparative fault is disregarded. Suter v. San Angelo Foundry & Mach. Co., supra, 81 N.J. at 167-168, 406 A.2d 140; Tirrell v. Navistar, Int'l, Inc., 248 N.J. Super. at 401-402, 591 A.2d 643. In other than a workplace setting, in a product *479 liability case, plaintiff's comparative fault is limited to unreasonably and intentionally proceeding in the face of a known danger. Cepeda v. Cumberland Eng'g Co., supra, 76 N.J. at 186, 386 A.2d 816. If there is only a negligence claim raised by a plaintiff, a general comparative negligence defense can be raised, unless a claim was based upon the negligent manufacture of a product. See Green v. Sterling Extruder Corp., supra, 95 N.J. at 271-272, 471 A.2d 15. The issue before us is whether the Supreme Court's reasoning in Green should be extended to a situation where a worker encountered the results of negligent installation as opposed to the defective manufacture of a product. Foremost here asserts that if plaintiff is only entitled to a negligence claim against Foremost, he should not be entitled to the protection of the workplace injury doctrine of Suter, Green v. Sterling Extruder Corp. and the Product Liability Act.
We might start our analysis with Justice Clifford's opinion in Green v. Sterling Extruder Corp. The treatment of a plaintiff's fault as a bar to a claim had been originally explored in the seminal cases of Cepeda v. Cumberland Eng'g Co., Inc., supra, 76 N.J. at 183-188 (majority opinion) and 201-203 (dissenting opinion), 386 A.2d 816, and in Suter v. San Angelo Foundry & Mach. Co., (which overruled Cepeda), 81 N.J. 167-168, 177 (majority opinion) and 199-201 (Justice Clifford's concurrence), 406 A.2d 140.[4] In Green v. Sterling Extruder Corp., Justice Clifford explained that "the Court remains not of one mind on the issue that divided us in Suter," but that the issue would not be resolved in Green. 95 N.J. at 270, 471 A.2d *480 15. Justice Clifford made it clear in Green that insofar as an employee was merely careless, as opposed to intentionally proceeding in the face of a known danger (for which, in Suter, Justice Clifford would have applied a comparative negligence defense), the employee's conduct may not be used to reduce an eventual award. He stated:
No member of the Court would permit that kind of conduct [ordinary carelessness] to bar or reduce a worker's strict liability claim in the employment circumstances presented.... [T]here is no suggestion of unreasonable or voluntary exposure to a known risk explicit or implicit in plaintiff's actions. Therefore, even those who would side with the minority view in Suter are satisfied that this test has not been met in this case.
Ibid.[5]
In Green v. Sterling Extruder Corp. the application of Suter's worker protection was expanded from the strict liability setting to encompass a claim of negligence concerning a product. The question certified by the court in Green was "whether, given the employment environment that would foreclose a contributory fault defense were the claim [was] one in strict liability, the same result should obtain when, as here, the injured worker's suit sounds in negligence." 95 N.J. at 271, 471 A.2d 15. The Court noted that the jury had already found that plaintiff "was using the machine for its intended or reasonably foreseeable purpose and was injured because of that machine's improper design and assembly." 95 N.J. at 272, 471 A.2d 15. Furthermore, the defendant's negligence was that it sold an inadequately guarded machine which defendant "should have foreseen might cause injury to one in the position of this plaintiff." Ibid. Quoting from a law review article, the Court *481 stated that the defendant had "a duty to protect persons from the consequences of their own foreseeable faulty conduct, [and therefore] it makes no sense to deny recovery because of the nature of the plaintiff's conduct." Ibid. quoting Marshall, "An Obvious Wrong Does Not Make a Right: Manufacturer's Liability for Patently Dangerous Products," 48 N.Y.U. Law Rev. 1065, 1088 (1973). Green's argument for extending the strict liability bar to the negligence setting involving a product can be summed up by the statement: "Contributory negligence would serve to excuse the very conduct that gives rise to strict liability on the part of the manufacturer. Precisely the same is true of the manufacturer's liability in negligence." Ibid. See also Suter v. San Angelo Foundry & Mach. Co., supra, 81 N.J. at 167, 406 A.2d 140; Bexica v. Havir Mfg. Corp., 60 N.J. 402, 412, 290 A.2d 281 (1972); Tirrell v. Navistar Int'l, Inc., 248 N.J. Super. at 402, 591 A.2d 643.
In the case before us, we of course cannot determine at this time whether Foremost was negligent either in placing the controls far away from the capstan or in failing to design the electrical hook-up so that there would be an emergency cut-off switch on or immediately adjacent to the capstan. Such a relocated control or cut-off switch would be in the nature of a safety device to prevent injury to one caught by the rotation of the capstan and the attached incoming line. The issue in this case is therefore so close to that of a manufacturer's design defect that we see no reason not to apply the same rules as in Green to appraise plaintiff's conduct.

IV  Remaining issues

Elimination of the comparative fault defense by no means establishes defendant's liability. Defendant claims that since the plaintiff was not specifically assigned to help dock the ship, the Suter/Green protection should be unavailable to him; as an untrained volunteer, he must bear the consequences of his actions. We reject this contention. A jury could find that when plaintiff operated the capstan and attached the line to help dock the ship he thought he was doing so within the *482 bounds of his employment. We would not have a defendant's liability for acting unreasonably in providing for the safety of others turn on the injured employee's job description.
This is not to say that all workplace injuries are immune from a comparative fault claim. The injury here was directly tied to the alleged negligence or alleged defective installation, but plaintiff's conduct while clearly work-related, might be found to have been as a volunteer for the particular duty. We accept the proposition that not every workplace injury where the plaintiff volunteers to perform a dangerous task is automatically compensable. A supplier of a service or a manufacturer may be faced with a claim from an untrained plaintiff who voluntarily proceeded to perform a dangerous task and who would not be expected to do so. In such a case, a failure to provide warnings or guards which would have been unnecessary to protect the expected sophisticated user should not be a basis for liability.[6] In some such cases the duty is *483 owed only to the reasonably-anticipated sophisticated user, not the untrained interloper. See N.J.S.A. 2A:58C-3a(2) ("ordinary knowledge common to the class of persons to whom the product is intended," is the standard for a design defect claim in a non-workplace setting); N.J.S.A. 2A:58C-4 (warning defect defense if warning given is geared to "persons by whom the product is intended to be used....")
But in a design defect case (and as we here determine, a negligent service case) involving the workplace, the statute does not apply.[7] At least as to the inattentive worker, the rules recognized from Suter to Green still apply to negate comparative fault. But a defendant may still show the lack of duty to protect the unsophisticated worker whose presence could not have been reasonably anticipated. In such a case the defendant is asserting a lack of negligence or the absence of a design defect, not the comparative fault of the plaintiff. We see no bar to this assertion by a defendant.
The alleged negligent or defective performance here is the failure to protect an inattentive worker who may have been injured by the rotating capstan. The fact that plaintiff's employer failed to have others on the dock as the ship approached, and that the untrained plaintiff was the individual hailed by the seaman aboard the docking ship, might be circumstances that affect the foreseeability of the particular use of the capstan and its controls at the time of this accident. But this issue attacks the question of defendant's negligence, not plaintiff's contributory fault.
*484 In sum, it appears that the trial judge correctly determined that Foremost's liability could only be based upon a claim of negligence. However, he incorrectly determined that plaintiff's conduct should be assessed in this situation on a comparative basis. The fact that the conduct may not be so assessed, however, does not preclude defendant from asserting that plaintiff's use of the capstan as he did was not reasonably foreseeable and, as such, defendant breached no duty to plaintiff.
The order appealed from is affirmed in part and reversed in part. The matter is remanded to the Law Division for further proceedings.
NOTES
[1] If Foremost had made no independent decision concerning the location of the switch and had not decided to install a cut-off on or near the capstan, that is, had made no independent design decision, there would be no liability.
[2] One operator monitored the incoming line, two received the docking line as it came off the capstan, and a fourth operator was stationed at the capstan controls. Plaintiff, a dock worker, was on the scene because he had been sent by his supervisor to pick up two bottles to sample petroleum products on the incoming vessel and to see that a vehicle was moved from the area of the south capstan.
[3] Judge Gruccio and Judge Brochin would refrain from declaring here whether the Product Liability Act encompasses other entities described in this footnote under the rubric of "manufacturers or sellers." At this time, they would leave to the pre-Act common law the question of whether these entities are strictly liable. Judge Dreier, however, would elaborate and add the following:

While there is no express legislative statement continuing common-law strict liability for other than traditional "manufacturers" or "sellers," there is no reason to suppose that the Legislature intended to overrule the then-existing Supreme Court authority expanding strict liability. For instance, under Cintrone v. Hertz Truck Leasing & Rental Serv., 45 N.J. 434, 212 A.2d 769 (1965), strict liability could be imposed upon the lessor of a truck. In Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965), strict liability was imposed upon the mass producer of homes for a defective hot water mixing valve contained within one of the homes. In Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 451 A.2d 179 (1982), a reconditioner and rebuilder of a machine owned by the plaintiff's employer was held strictly liable for a product defect in the rebuilt machine. In Ramirez v. Amsted Industries Inc., 86 N.J. 332, 431 A.2d 811 (1981), and Nieves v. Bruno Sherman Corp., 86 N.J. 361, 431 A.2d 826 (1981), the court imposed the responsibility of a manufacturer upon a successor corporation that merely continued the product line. Absent a contrary direction in the statute and committee statements, Judge Dreier would here determine that the terms "manufacturer and seller" as used in N.J.S.A. 2A:58C-2 were intended by the Legislature to incorporate the then-existing law of the State concerning those entities potentially responsible for the distribution of defective products into the stream of commerce. To do otherwise would upset several foundational decisions in this field. The Legislature could not have intended, without comment, to effect such a basic change in product liability law.
[4] See also the majority's footnote 5, 81 N.J. at 167, 406 A.2d 140, ostensibly in response to Justice Clifford's argument that the majority had limited the bar to a contributory negligence defense only to "the employee-factory machine setting." He gave many other examples of employees in work settings and asked why there should have been a factory limitation. 81 N.J. at 200, 406 A.2d 140. Justice Schreiber responded in footnote 5 that the Court was "not herein passing upon other situations wherein an employee may similarly be held to have had no meaningful choice." 81 N.J. at 167, 406 A.2d 140.
[5] This court has applied this principle in Crumb v. Black & Decker (U.S., Inc.), 204 N.J. Super. 521, 527-528, 499 A.2d 530 (App.Div. 1985), certif. granted, 102 N.J. 386, 508 A.2d 247 (1985), appeal dismissed, 104 N.J. 432, 517 A.2d 425 (1986), and Tirrell v. Navistar Int'l, Inc., supra, 248 N.J. Super. at 400-401, 591 A.2d 643 to workplace settings outside of factories, and to other than dangers presented by machine tools. Also, the Legislature's use of the term "workplace," in N.J.S.A. 2A:58C-1 et seq. is clearly broader than Suter's "factory" setting.
[6] Defendant has also argued correctly that employees can be negligent in a workplace setting in a manner that has nothing to do with the employer's business. An example given at oral argument was a drunken employee engaged in horse-play sliding across a factory floor and falling against an unguarded machine, the operation of which was of no concern to him as a volunteer or otherwise. Another example might be a plaintiff driving his employer's vehicle recklessly on the employer's property when a defective tire blows out for reasons unconnected with the plaintiff's manner of driving, and both the defective tire and manner of driving cause plaintiff's injuries. It is an open issue whether the Suter rule should bar consideration of the plaintiff's unrelated comparative fault in an action against the tire manufacturer. The negligent conduct in such a case might be considered as having no relation to the decision of plaintiff to use the defective equipment, nor would it have been connected to the defect in any way. This issue has never been considered by the Supreme Court or this court.

Such cases are not before us, nor do any of the cases here cited discuss the responsibilities in such settings. We do not read the language of Suter or Green, or our explanations in Crumb, Tirrell or the case before us as foreclosing the argument that such an employee's actions might be considered within the bounds of the non-workplace rules of Cepeda and Suter. We must, however, await the case where such an issue can be briefed and argued within a specific factual context before definitive guidelines can be established.
[7] The consumer expectation/obvious danger defense established by N.J.S.A. 2A:58C-3a(2) is inapplicable in this case since the defense "shall not apply to industrial machinery or other equipment used in the workplace...." Nor is it applicable "to dangers posed by products such as machinery or equipment that can feasibly be eliminated without impairing the usefulness of the product[.]" The dock was clearly plaintiff's workplace, and the claimed defect here is that the danger could have been eliminated with the installation of a simple shut-off switch.