703 A.2d 340

DOMINICK CONGIUSTI AND NANCY CONGIUSTI, PLAINTIFFS–APPELLANTS, v. INGERSOLL–RAND COMPANY, INC., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 5, 1997—Decided December 11, 1997.

Before Judges DREIER, KEEFE and PAUL G. LEVY.

*John R. Altieri* argued the cause for appellants.

*Kenneth R. Meyer* argued the cause for respondent (*Porzio, Bromberg & Newman*, attorneys; *Mr. Meyer*, of counsel and on the brief, and *Kevin J. O'Connor*, on the brief.)

The opinion of the court was delivered by

DREIER, P.J.A.D.

Plaintiffs, Dominick Congiusti and Nancy Congiusti, appeal from a judgment for defendant, Ingersoll–Rand Company, Inc., based upon a jury verdict in this product liability action. While employed by Mayrich Construction Company on April 28, 1990, Dominick Congiusti ("plaintiff," when used in the singular) was injured when an Ingersoll–Rand ECM–350 crawlair drilling machine which he was attempting to move lurched towards him, pinning him against an adjacent machine. Plaintiffs claimed that the accident was caused by a design defect in the machine. Defendant denied the existence of a defect and contended that the accident was caused solely by plaintiff's negligence.

Plaintiff was an experienced operator of the machine, and his employer owned several similar machines manufactured both by Ingersoll–Rand and Gardner–Denver. The machine in question, which was used to drill holes in hard surfaces, including rock, was air-powered and self-propelled. It moved, or in the terms of the trade, trammed, on two wide treads, controlled by handles mounted on a moveable plate located at the left rear of the machine. Each handle controlled one of the treads and to be operated, the handle had to be manually moved from a detent position by forcibly indexing the handle, which could then be moved forward or backward, thereby controlling the treads. When a handle was released, a strong spring immediately moved it to the neutral position and the tread would instantly stop. Thus, without pressure on the handles the machine would not move.

The plate on which the tramming control handles were located also contained several smaller levers that controlled the drilling operation. The plate itself could be pivoted horizontally around the rear left corner of the machine into one of three settings. The zero degree setting was directly behind the left rear of the machine; the forty-five degree setting was behind the rear left corner of the machine; and the ninety degree setting faced the rear left side of the machine.

At the time of the accident, plaintiff had been instructed by his superior to move the machine to a flatbed truck so that it could be taken to a job site. Plaintiff turned on the machine, activating the air pressure that operated the controls which were set in the ninety degree position. Plaintiff therefore was standing on the ground, facing the left rear side of the machine and had his back to a similar machine parked immediately adjacent to the one he was operating. When he moved the handles forward, the machine lurched towards him, pinning his arms and forcing his body against the controls. This position prevented the safety springs from returning the handles to their neutral and detent position which would have deactivated the power. Instead, plaintiff continued to be pinned against the adjacent machine, causing him to lose consciousness and suffer severe injuries.

Plaintiffs' expert asserted that one of two additional safety devices should have been incorporated into the design of the machine. First, plaintiffs claimed that there should have been a cover over the control panel so that a body could not be pressed against the control panel and could not prevent the operation of the release mechanism. Second, plaintiffs' expert testified that there should have been a platform on which the operator could stand so that there would be no relative motion between the machine and the operator, and the platform itself would have acted as a safety guard or bumper preventing an accident such as this from happening. Defendant's experts asserted that either or both of these design changes would have materially and adversely affected the operation of the drilling machine which often had to be maneuvered in tight spaces and with easy access to the controls.

Defendant further contended that the sole cause of this accident was plaintiff's negligent decision to operate the machine from the ninety degree position, where he could be tightly wedged between the machine and the one to its left. Since there also was little room to the rear of the machine, similar dangers might have been present if it were operated from the zero degree position. The

safest position to operate the machine according to defendant was from the forty-five degree position, and plaintiff's decision to manipulate the machine from a position of danger was, in defendant's view, the sole proximate cause of this accident.

## I.

Plaintiffs raise three points on this appeal. They first contend that the testimony of defendant's experts went far beyond the experts' reports supplied to plaintiffs prior to trial. Thus, they conclude, the trial court erred in "permitting defendant's experts to testify and to offer opinions never disclosed during discovery." This claim is only partially accurate because the broad subject areas were covered. While the experts had not fully disclosed their theories in their reports, had they been deposed by plaintiffs, their depositions might have fully revealed the bases for their eventual testimony. *See Mauro v. Owens–Corning Fiberglas Corp.*, 225 *N.J.Super.* 196, 206, 542 *A.2d* 16 (App.Div.1988), *aff'd sub nom., Mauro v. Raymark Indus., Inc.*, 116 *N.J.* 126, 561 *A.2d* 257 (1989) (affirming the exclusion of expert testimony regarding statistics because such statistics "were not contained in [the expert]'s written report *or any other discovery material*") (emphasis added). Further, as we noted in *McCalla v. Harnischfeger Corp.*, 215 *N.J.Super.* 160, 521 *A.2d* 851 (App.Div.), *certif. denied*, 108 *N.J.* 219, 528 *A.2d* 36, 37 (1987), "[w]hen an expert's report is furnished, 'the expert's testimony at trial may be confined to the matters of opinion reflected in that report, . . . .' [h]owever, the logical predicates for and conclusions from statements made in the report are not foreclosed." *Id.* at 171, 521 *A.2d* 851 (quoting *Maurio v. Mereck Constr. Co., Inc.*, 162 *N.J.Super.* 566, 569, 394 *A.2d* 110 (App.Div.1978)).

While a trial judge may in his or her discretion preclude expert testimony on a subject not covered in the written reports furnished by an adversary, in *Ratner v. General Motors Corp.*, 241 *N.J.Super.* 197, 202, 574 *A.2d* 541 (App.Div.1990), we strongly urged the trial judge in the exercise of his discretion to "suspend

the imposition of [the] sanction[ ] [of exclusion]" when certain factors were present. These were "(1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from the admission of the evidence." *Ibid.* (quoting *Westphal v. Guarino*, 163 *N.J.Super.* 139, 145–46, 394 *A.*2d 377 (App.Div.), *aff'd o.b.*, 78 *N.J.* 308, 394 *A.*2d 354 (1978)).

In this case, we have read the testimony of defendant's experts, and we have examined their reports. It does not appear that plaintiff's attorneys should have been surprised, except as they had failed to depose the experts, and thus were unaware of the details of the experts' opinions.

Defendant's three experts were Ewald Kurt, a former engineering manager of the Rock Drill Division of Ingersoll–Rand and one of the designers of the drilling machine; John L. Wood, former chief engineer for the Drill Carrier Division of Gardner–Denver, who was so employed when the equivalent Gardner–Denver unit was designed; and Thomas Voit, a professional engineer, who testified to the lack of defective design in the ECM–350 and as to his own observations of the Gardner–Denver equipment. We will briefly describe their testimony.

Wood's report, dated September 23, 1993, compared the competing machines and specifically discussed the inherent problems with platforms and shielding devices. Plaintiffs, who chose not to even inquire by deposition into Wood's broader opinions on these subjects, should not be heard to complain when Wood merely elaborated on the points he raised in his initial report. The same is true of Kurt, who was permitted to testify whether the machine was safer without a platform and whether such a platform would pivot. His report contained an extended reference to Ingersoll–Rand's decision not to include a platform in the design of the machine. Lastly, plaintiffs dispute Voit's testimony, urging that his reports were conclusory and stated only net opinions. Voit was questioned concerning the basis for his opinions which are generally stated in his two reports.

The decision not to include a platform in the ECM–350, even though there was a platform on the Gardner–Denver unit, is analyzed in all of the experts' reports. Kurt stated clearly that an operator would be safer on the ground than on a platform. Wood concluded that the ECM–350 design was superior for several reasons, and that particularly in the case before us, the platform would have gone under the tank at the end of the adjoining machine and plaintiff would have been hurt more severely. Further, a platform would have prevented close work and would have prevented the operator from standing in a variety of locations. Voit stated that a platform would interfere with the machine's movement over rough and irregular terrain and would at certain angles, compromise the operator's stability. In addition, Voit actually operated the machine at the location and from this personal experience concluded in his report "that the incident occurred as a result of conditions and circumstances unrelated to the design of the machine in question."

The deviation from these reports at trial was sufficiently minimal that we see a lack of prejudice to plaintiffs, especially as plaintiffs chose not to depose the witnesses to flesh out any questions they may have had concerning the bases for or the scope of the opinions expressed in the reports. We see no design to mislead, no significant surprise to plaintiffs, and therefore no prejudice as a result of this testimony. The testimony is logically related to the information contained in the reports. *See McCalla, supra,* 215 *N.J.Super.* at 171, 521 *A.*2d 851; *Ratner, supra,* 241 *N.J.Super.* at 202, 574 *A.*2d 541.

## II.

Plaintiffs next challenge the jury charge as (a) failing to inform the jury that plaintiff's comparative negligence could not be considered in this case under the rule of *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 167–68, 406 *A.*2d 140 (1979); (b) charging that plaintiff's fault could be considered if it were the sole proximate cause of the accident; and (c) placing the question

of plaintiff's responsibility as the first jury interrogatory. Under *Suter*, a product defendant may not "as a matter of policy" raise as comparative negligence the actions of an employee "engaged at his assigned task," on a plant machine. 81 *N.J.* at 167, 406 *A.2d* 140. The trial judge recognized this rule at pretrial and properly struck the defense of comparative negligence. She did not, however, specifically inform the jury of this ruling until she gave a brief recharge on proximate cause after a jury question concerning design defect.

### a.

During the trial, defendant successfully argued to the court that while comparative negligence could not be used to calculate a percentage allocation of negligence, it could be relevant to the issue of whether the entire fault for this accident was that of plaintiff rather than the design of defendant's machine. As stated previously, defendant asserted that plaintiff's negligent conduct was the sole proximate cause of the accident. As such, claimed defendant, it was irrelevant whether the machine was or was not defectively designed since even if it were, this defect would not have been sufficiently connected with this accident to be actionable. Specifically, defendant contended that had plaintiff operated the machine in the forty-five degree position, there would have been no possibility of being pinned in the event of a malfunction. Therefore, defendant urged that plaintiff's choice to operate the machine in the ninety degree position was the sole proximate cause of this accident.

There is no question that the comparative negligence of a plaintiff is generally disregarded in a workplace setting. *See Suter, supra,* 81 *N.J.* at 167–68, 406 *A.2d* 140; *Ramos v. Silent Hoist & Crane Co.,* 256 *N.J.Super.* 467, 478, 607 *A.2d* 667 (App. Div.1992). There remain, however, limited uses, as defendant asserts here, of a plaintiff's negligent conduct in a product liability

action.[1] Where this is so, however, there must be strict jury instructions regarding the jury's use of evidence of plaintiff's fault. *See Jurado v. Western Gear Works,* 131 *N.J.* 375, 389–91, 619 *A.*2d 1312 (1993); *Johansen v. Makita U.S.A., Inc.,* 128 *N.J.* 86, 99–103, 607 *A.*2d 637 (1992).

The problem with the court's acquiescence in defendant's claim that plaintiff's conduct could have been the sole proximate cause of this accident, is that there was no proof that plaintiff's conduct was negligent. Nowhere in this record is there any showing that plaintiff, his employer, the experts, or the manufacturer was aware that the ECM–350 machine had ever lurched towards an operator as occurred here. The jury, therefore, could not have found that plaintiff's choice to operate the machine from the ninety degree position was unreasonable. With hindsight, it is easy to say that plaintiff's operation from the forty-five degree position would have avoided this accident. But the "empty chair" defense, alleging that plaintiff's negligence was the sole cause of this accident, thus avoiding the *Suter* rule, requires proof of negligence, a showing that was absent here.

It is not enough for a defendant to show that a non-negligent decision of a plaintiff put him in a position where he would be injured, and that a different decision concerning his position would have avoided the accident. The logic of this conclusion should be apparent if one considers an ordinary situation of driving an

[1] We noted in *Fabian v. Minster Mach. Co., Inc.,* 258 *N.J.Super.* 261, 609 *A.*2d 487 (App.Div.), *certif. denied,* 130 *N.J.* 598, 617 *A.*2d 1220 (1992) that even though a defense of contributory or comparative negligence may be properly stricken when an employee is injured at a workplace task, "[s]uch evidence, however, may be admissible on the issue of proximate cause." *Id.* at 277–78, 609 *A.*2d 487. So too in this case. This is but another example of the "empty chair" defense, discussed in *Fabian. Id.* at 276–77, 609 *A.*2d 487. Although in *Fabian* the "empty chair" to which the defendant manufacturer attempted to assign the total causation was the otherwise non-liable employer, this defense can be asserted against any party or non-party against whom no viable claim may be made. It may be a defendant who has already settled, a coemployee, a statutorily-immune party, or, as here, a plaintiff benefitting from the *Suter* contributory negligence holding.

automobile. A plaintiff may decide to drive in the right hand lane next to a large truck which unfortunately jack knifes and falls on the car. We certainly would not consider as a defense a claim that if plaintiff had driven faster or slower so that he would not have been in the lane next to the truck or had changed lanes to drive behind the truck, he would not have been injured in the accident. The decision merely explains plaintiff's position. Unless a jury could determine that plaintiff's decision was negligent, his conduct is an irrelevancy, whether the *Suter* rule applies or not.

### *b.*

Plaintiffs next challenge the court's charge on this subject. In the judge's initial charge she stated:

> Now the defendant as well has a claim here that you will hear about having to do with the plaintiff standing in a certain position when he operated the machine.

The judge then explained that the same preponderance of the evidence standard would apply to defendant's claim as the plaintiffs'. After discussing the plaintiffs' allegations, the judge returned to this subject. After explaining that defendant's defective design, if proven, might not have been a contributing factor in the happening of the accident if there was an independent intervening cause, she then charged:

> Now, the defendant says, "Yes, there was such an intervening cause." And they must prove that to you. An intervening cause is the act of an independent agency which destroys the causal connection between the effect of the defect in the product and the accident. The independent act being the immediate and sole cause in which case the liability will not be established because the defect in the product is not the [sic, should be "a"] proximate cause of the injury.

> Alright. Now, as to that last portion, the defendants, as I said, must prove that. And their contention is that ... the plaintiff being an experienced user of the machine, he should have looked around him and utilized the different position in tramming the machine that would have avoided his getting crushed.

> They must prove to you that that—whether he did or not did not or could or could not have done that *was the sole reason for the accident. Not part reason. Not even the greater portion of the reason but the sole reason for this accident in order for them to prevail on that question.*

> [Emphasis added.]

■ Under the defendant's theory of the case, accepted by the court, the final paragraph of this charge should have made it clear to the jury that plaintiff's conduct could be considered only if he was solely responsible for the accident. Even if we had accepted defendant's theory that plaintiff was negligent, it might have been better if the judge had added two separate paragraphs, one explaining to the jury that there was no comparative fault permitted, *i.e.,* no offset against a defendant's responsibility for plaintiff's negligence in this setting, and the other reiterating that plaintiff's choice of location had to be found negligent on his part. The judge failed to do so in her initial charge, but we do not see this as fatal in view of the jury's verdict for plaintiffs on this point.

Equally important is the fact that the jury was recharged when they returned with a question concerning design defect. At the end of the design defect recharge, the judge asked the jury whether any of the jurors needed a recharge on proximate cause. Obviously a juror raised his or her hand, because the judge stated "O.K." and then recharged as follows:

> The last requirement for holding a defendant liable is that the defect, whatever you find it to be, must have been a proximate cause of the accident. By proximate cause is meant that the defect in the product was a substantial factor which singly or in combination with another cause, *but that cause now cannot be Mr. Congiusti. You may not consider anything that Mr. Congiusti did or didn't do now.* ...
> [Emphasis added.]

The judge then concluded the proximate cause charge.

This whole point might well be considered moot by the jury's specific determination that plaintiff's conduct was not the sole proximate cause of the accident. Citing *Johansen v. Makita U.S.A., Inc., supra,* 128 *N.J.* at 95, 101, 607 *A.*2d 637, plaintiffs contend that the jurors had not been given a specific instruction to avoid balancing plaintiff's conduct against the allegedly defective product in determining comparative responsibility. Our view of the original and supplemental charges has disabused us from any thought that such a problem existed in this case. Even our conclusion that plaintiff could not have been found negligent on these proofs does not warrant reversal when the jury found

plaintiff free from the total responsibility that the court charged was the only basis to offset any liability of defendant.

### c.

Plaintiffs also object to the judge having placed the jury interrogatory concerning plaintiff's negligence first, rather than following the traditional pattern of first determining defendant's responsibility and then inquiring about plaintiff's conduct. Plaintiffs claim that this decision detracted from the issue of design defect, which, we agree, was the sole real issue in the case. The judge explained to the jury, however, that she departed from first determining plaintiffs' primary claim in this case of a defective product, because if plaintiff's conduct had been proven as the sole proximate cause of the accident, "that would be the end of this case. So we put that question first." While this is unusual, we cannot fault the judge for this innovation as she saw the unusual facts of the case before her. If she had been correct that plaintiff's choice of position could be equated with plaintiff's negligence, the order of the questions would have shortened the jury's deliberation.[2]

### III.

The jury found specifically that the absence of either or both of the alleged alternative designs or safety devices were not design defects. We note that in this case, as in most other design defect cases that are not controlled by the absolute defenses to design defect claims in the Product Liability Act, *N.J.S.A.* 2A:58C–3a, the issue centers upon whether, in the words of the *Restatement (Third) of Torts: Products Liability* § 2(b) (1997 Proposed Final Draft), there was a "reasonable alternative design ... and the

---

[2] Also, by placing this question first, we are given an insight into the jury's view of plaintiff's conduct. Had the questions been placed in the reverse order we might have been left with a question whether the jurors had understood the limited, and as we have found, erroneous, role that plaintiff's conduct was to play in this case.

omission of the alternative design renders the product not reasonably safe." This has been recognized in *Smith v. Keller Ladder Co.*, 275 *N.J.Super.* 280, 284, 645 *A.*2d 1269 (App.Div.1994), and *Grzanka v. Pfeifer*, 301 *N.J.Super.* 563, 579, 694 *A.*2d 295 (App. Div.), *certif. denied,* —— *N.J.* —— (1997). Although other possibly relevant elements of a risk utility analysis are to be charged unless or until the Supreme Court adopts the Restatement standard,[3] in most cases the inquiry as framed by the Restatement will most probably present the issue to a jury in a clear and well-defined manner.

## *IV.*

Lastly, plaintiffs object to defendant's use of an exemplar control panel during the trial. Plaintiffs contend that had they known the exemplar was going to be used, they would have brought in the actual control panel, and that the prejudice was irreparable. Plaintiffs also claim that a brochure was shown to the jury which illustrated the potential for operating the machine in the ninety degree, forty-five degree and zero degree positions in an open area and was headed "FASTER, SAFER TRAMMING," and that this somehow prejudiced plaintiffs. At trial, the judge recognized that the exemplar controls were not exact replicas and, in fact, told plaintiffs' counsel that plaintiff could resume the stand to testify to the dissimilarities. The judge obviously found implicitly that the use of the exemplars was not more prejudicial than probative. *N.J.R.E.* 403(a).

It is difficult for us to understand plaintiffs' claim of undue prejudice from this evidence. The operation of the machine was testified to by plaintiffs' and defendant's witnesses on several

---

[3] In the unusual case where other risk utility elements or other facts will control the case, the Restatement comments note that the "reasonable alternative design" standard might be subject to some modification. *See Restatement (Third) of Torts: Products Liability* § 2, comment b (1997 Proposed Final Draft), and Reporter's Notes applicable thereto.

occasions, and the issues of design defect and plaintiff's negligence were clearly before the jury. We see no prejudice.

## V.

██ Plaintiffs argue that plaintiff's conduct must have been taken into account because if there was no design defect and plaintiff's negligence was not the sole cause of the accident (or, as we have found, his conduct was irrelevant to the issue), there was no explanation for how the accident occurred. Rather than being a source of error, this is the explanation for the verdict. There merely was no culpable explanation for this accident presented to the jury. For some unexplained reason, the machine operated in an unusual manner,[4] and the resultant accident unfortunately pinned plaintiff's arms so he could not turn off the machine, nor could the automatic safety devices be triggered. The manufacturer is not an insurer against all injuries; rather the manufacturer is responsible only if there is proof of a design defect. Here, there was a failure of such proof.

Affirmed.

---

[4] We can, after reading the record, opine how the accident might have happened, without expressing a view as to the cause. When plaintiff pushed both levers forward, the left tread must have moved forward, but the right tread moved backwards. The machine would then have pivoted, throwing the rear left corner against plaintiff. From the proofs, which showed the levers depressed as plaintiff claimed, we can only guess that some internal malfunction, from maintenance, job stresses, dirt in the system or the like created a unique derangement of the connections, which could not be later duplicated.