215 N.J. Super. 160 (1987)
521 A.2d 851
MICHAEL MCCALLA, PLAINTIFF-RESPONDENT,
v.
HARNISCHFEGER CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted January 14, 1987.
Decided February 9, 1987.
*162 Before Judges FURMAN, DREIER and STERN.
Crummy, Del Deo, Dolan, Griffinger & Vecchione attorneys for appellant (David J. Sheehan, on the brief).
Wysoker, Glassner & Weingartner attorneys for respondent (Raul I. Gonzalez, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendant has appealed from a Law Division judgment of $867,230, entered after the addition of interest to a $650,000 jury verdict in this product liability case.
*163 In 1958 defendant, Harnischfeger Corp., designed and constructed an overhead crane in accordance with specifications provided by Irvington Steel & Iron Works (Irvington), the predecessor in interest to New Jersey Precast Company (Jersey Precast), plaintiff's employer. The crane was shipped to Irvington's iron foundry in three railroad cars and was installed on elevated rails which were permanently affixed to Irvington's premises[1]. Defendant serviced the crane on May 21, 1970 and March 31, 1981. Jersey Precast purchased Irvington's real property and improvements including the crane from Irvington's trustee in bankruptcy on October 2, 1972. At that time the business at the site changed from the original foundry to the manufacture of concrete highway dividers. The new owners continued to use the crane, principally to pour concrete from buckets into forms, and then to move the newly constructed highway barriers.
Plaintiff, a welder, was injured on September 11, 1981 when welding a fixed steel beam to another suspended by a wire high above the factory floor. He had been transported to the site in the cab of the crane. The crane struck the suspended beam causing it to hit plaintiff who fell from his work area. Luckily, he was able to grasp a piece of steel to keep from falling to the ground, although he suffered serious and permanent injuries. Suit was instituted September 15, 1981.
Plaintiff's expert witness stated that the crane had three types of design defects causally related to the accident, namely, a lack of windows on the side and rear of the cab and a lack of mirrors, all of which severely limited the operator's visibility; *164 secondly, a lack of "bells, horns and buzzers to alert workers of the dangers of the hazards of a crane moving unexpectedly;" and lastly, a lack of sweeps, a safety device which should have extended below the top of the rail and in front of the wheels[2].
Defendant proffered Peter Schwalje, a mechanical engineer, to support its contention that the crane had no design defects. However, when Schwalje began testifying as to his investigation of the crane, plaintiff objected on the ground that the expert's report was conclusory and had not been based upon any disclosed factual data. After an Evid.R. 8 hearing, the trial judge determined to limit the expert's testimony to a negation of the claims of plaintiff's expert, Mauer. Schwalje was prohibited from rendering his own opinion as to the safety of the design. The judge added:
What I am permitting him to do is ... testify really on a negative fashion to negative Mauer[,] but I'm not allowing him to go beyond that. I am not allowing him to say that in his opinion this was a safe machine or that this machine met the highest standards, or, anything of that nature, I'm not going to permit [it].
About a year before trial commenced on June 19, 1985, defendant's counsel informed plaintiff's attorney by letter dated June 27, 1984 that Schwalje would testify that "the crane design conformed to all existing standards, written or otherwise," and that the crane was not defective for any reason, including the reasons set forth in Mauer's report. Schwalje's report, which had been furnished to plaintiff shortly after the letter was received, stated that the expert had visited the site and had taken various described photographs. The report concluded that the crane had been designed in accordance with applicable codes.
Inspection of the crane itself revealed the unit to be of conventional design and construction and although poorly maintained, to operate properly. The writer could detect no deficiency in the design or construction of the unit which would *165 have related to the occurrence of the accident as reported. In the writer's opinion the crane was designed and constructed in conformance to accepted practice and violated no known codes or standard applicable thereto.
This report apparently was intended only to be preliminary, although a final report was never filed.
Defendant has raised three points on this appeal. First, defendant contends that the architects and contractors statute of repose, N.J.S.A. 2A:14-1.1, barred any claim with respect to the design or installation of the crane. Second, defendant contends that plaintiff's conduct in voluntarily encountering a known danger may serve to bar or reduce his claim against defendant. Lastly, defendant asserts that the trial judge's preclusion of defendant's expert's testimony constituted an abuse of discretion, warranting reversal.

I
N.J.S.A. 2A:14-1.1 provides, in part:
No action ... to recover damages for any deficiency in the design ... or construction of an improvement to real property, ... or for bodily injury ... arising out of the defective and unsafe condition of an improvement to real property ... shall be brought against any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property, more than 10 years after the performance or furnishing of such services and construction.... [Emphasis added].
The narrow issue before the trial judge was whether the overhead crane was an "improvement to real property" within the meaning of N.J.S.A. 2A:14-1.1. The trial judge correctly determined that it was not. He explained:
[The limitations period] protects the builders of property and those additions to the property which are generally part [of the building,] such as heating, electricity, air conditioning, those sort of things. To me what we're dealing with here, the crane, is not within the coverage of that particular section, whether you call it the statute of limitations or other phrase they use to describe it. I don't think that defense is available in this case and I'm now so ruling.
* * * * * * * *
[T]he court does not feel that particular statute of limitations depends upon the traditional definitions of ... real estate and [personal] property. The cases under that statute limit to traditional buildings and traditional accessories to *166 buildings. A crane does not fall in that category, in the judgment of this Court and this crane is for the purpose of that statute, personal property ... [I]t's better to say it is not just within the coverage of that particular statute even though it may be dug into the ground and everything else, it's not within the statute.
We agree with the trial judge's determination of this issue, but feel that further explanation is warranted. First, the statute is not a statute of limitation in the traditional sense; rather, it is a statute of repose conferring immunity 10 years after the performance of the services which would have occasioned liability but for the statute, and notwithstanding the fact that the intended useful life of the product may have been for 20 or even 50 years.
We approach the characterization of this crane with reference, not to a negligence or strict liability decision, but rather to a taxation case, City of Bayonne v. Port Jersey Corp., 79 N.J. 367 (1979), interpreting the Personal Property Tax Act, N.J.S.A. 54:11A-2. The property there under consideration was giant cranes, held by the court to be personal property subject to the Act. The Act imposed a personal property tax upon "tangible goods and chattels used or held for use in any business," but excluded "goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto."[3] This case signalled the demise of New Jersey's "institutional doctrine" as the basis for defining a "fixture." It is clear from the opinion that the abolition of the institutional doctrine was intended as having far-reaching effects[4]. Prior to City of Bayonne, New Jersey *167 subscribed to the institutional doctrine which expanded the definition of fixtures to include even readily removable personal property necessary to the operation of the structure for its particular use. The focus of the institutional doctrine was on the integration of the product into the use of the structure, virtually eliminating the requirement of physical annexation to the extent that removal would materially injure the freehold. As described by the court in Smyth Sales Corp. v. Norfolk B. & L. Ass'n, 116 N.J.L. 293, 298 (E. & A. 1935):
When a chattel which, clearly, is permanently essential to the completeness of a structure, having regard to the character of that structure and the functioning of it in the use for which it was obviously designed, is actually, purposely and lawfully affixed to and into the structure, it becomes, in our opinion, a part of the realty; and if the severance of it will prevent the structure from being used for the purpose for which it was erected or for which it had been adapted, then the article is not severable without material injury to the freehold.... In such a situation th degree of affixation is less important than the indispensability of that which is affixed.
For example, in Feder v. Van Winkle, 53 N.J. Eq. 370 (E. & A. 1985), the institutional doctrine was applied to heavy machinery constituting the operating equipment for the manufacture of structural ironwork; in Temple Co. v. Penn Mutual Life Insurance Co., 69 N.J.L. 36, 38 (Sup.Ct. 1903), the doctrine was applied not only the permanent lighting equipment, but also to the seats in a movie theatre, affixed merely by screws. It was also applied to refrigerators in an apartment house, connected only by a plug. Russ Distributing Corp. v. Lichtman, 111 N.J.L. 21 ((E. & A. 1933). And see discussion in Fahmie v. Nyman, 70 N.J. Super. 313, 318-320 (App.Div. 1961), collecting *168 other examples of the application of the doctrine. As noted in City of Bayonne, the institutional doctrine "had few, if any, defenders." 79 N.J. at 375. It was there abolished and replaced by a fixture definition limited to items which if removed would "do irreparable or serious physical injury or damage to the freehold." 79 N.J. at 378.
We recognize that the statutory language before us, "improvement to real property," is broader than the definition of a fixture, since it includes the real estate itself and encompasses the brick, mortar, glass, steel or other building material that constitute the structure. But it is also clear to us that the definition goes no further than such real estate and structures, and fixtures attached thereto. See Ilich v. John E. Smith Sons Co. Inc., 145 N.J. Super. 415, 418-419 (Law Div. 1976); and see Brown v. Jersey Central Power & Light Co., 163 N.J. Super. 179, 195 (App.Div. 1978), certif. den. 79 N.J. 489 (1979). In Brown the product was a free-standing electric transfer switch assembly necessary for the normal functioning of an Air Force base's diesel power plant for a "Missile Master System." The unit, contained in a separate building, would have been a fixture under any definition of the word, although Brown was decided before City of Bayonne abolished the institutional doctrine. In Brown this court expressly disagreed with Wiggins v. Proctor & Schwartz, 330 F. Supp. 350 (E.D.Va. 1971) which had held a large production-line machine, bolted to the floor, to fall within the Virginia statute of repose. But see Feder v. Van Winkle, supra. Brown, although holding the switch-assembly to be within the statute of repose, specifically excluded equipment and chattels "brought into a structure after it is architecturally and mechanically suitable for occupancy for the purpose intended... e.g., furniture, production machinery, appliances, etc." 163 N.J. Super. at 197[5].
*169 City of Bayonne v. Port Jersey Corp. is also instructive for its specific holding, namely, that the property there under consideration, giant cranes used to load and unload containerships, were personal property as opposed to fixtures. A later legislative guideline, N.J.S.A. 54:11A-3.2, specifically included "cranes and structures attached thereto essential to their operation, which are primarily used for the loading and unloading of containers from containerships docked within the various ports and harbors of the State" within the coverage of the business personal property tax.[6]
From the foregoing analysis it is clear to us that the crane in question was not a fixture and, therefore, not governed by the statute of repose, N.J.S.A. 2A:14-1.1. Although the building with the crane in place has been used first as a foundry and then for the construction of concrete highway barriers, with the crane removed it could be put to other uses. The crane is merely a large piece of "production machinery," noted in Brown v. Jersey Central Power & Light Co., supra, 163 N.J. Super. at 197, to be outside of the protection of the statute. It is subject to such claims as may be made with respect to any other allegedly defective product.

II
Defendant's claim that plaintiff unreasonably and voluntarily encountered a known danger is effectively barred by Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 167 (1979). Plaintiff's welding activity in the precarious location required by his employer and in the proximity of the allegedly *170 defective crane falls within the Suter exception to the "assumption of risk" conduct otherwise permitted as a defense in strict liability cases for either of two reasons. Initially, as noted by the court in Suter:
[A]n employee engaged in his assigned task ... has no meaningful choice. Irrespective of the rationale that the employee may have unreasonably and voluntarily encountered a known risk, we hold as a matter of policy that such an employee is not guilty of contributory negligence. [81 N.J. at 167].
Cf. Green v. Sterling Extruder Corp., 95 N.J. 263, 264, 270 (1984); Crumb v. Black & Decker (U.S.), Inc., 204 N.J. Super. 521, 527 (App.Div. 1985), certif. granted, 102 N.J. 386 (1985), appeal dismissed, 104 N.J. 432 (1986). Secondly, although the dangers of the welding job were apparent to plaintiff, there was no showing that he recognized the danger of the alleged design defects in the crane and proceeded in the face of that latter danger. See Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 563 (1980); Crumb v. Black & Decker (U.S.), Inc., supra, 204 N.J. Super. at 530.
The trial judge correctly determined this issue, and we find no substantive ground for reversal.

III
The sole error that we find in the case was the trial judge's evidence ruling, quoted earlier, concerning the limitation of the testimony of the defendant's expert, Schwalje. R. 4:17-4(e) provides that
[i]f an interrogatory requires a copy of the report of an expert witness ..., the answering party shall annex to the interrogatory an exact copy of the report or reports rendered by the expert ... or a complete summary of any oral report.
Further, R. 4:10-2(d)(1) permits a party to require an adversary to state by answers to interrogatories "the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion...." In this case, however, plaintiff has claimed neither that these requests authorized by the Rules were made of defendant nor that this information was unavailable by deposing the expert as permitted by R. 4:10-2(d)(2). We note further that if an interrogatory *171 answer indicates that a report will be thereafter supplied, R. 4:17-4(e) permits "the propounder [to] ... move for an order of the court fixing a day certain for the furnishing of that information by the answering party." No such order was secured.
When an expert's report is furnished, "the expert's testimony at trial may be confined to the matters of opinion reflected in the report." Maurio v. Mereck Construction Co. Inc., 162 N.J. Super. 566, 569 (App.Div. 1978). However, the logical predicates for and conclusions from statements made in the report are not foreclosed. This principle is best exemplified by Hall v. Zuckerman, 202 N.J. Super. 455, 458 (App.Div. 1985). There the defendants proffered two expert witnesses in the field of computer programming and music engraving. No written reports were provided, but defendant stated in answer to interrogatories that the experts would testify that
the computer programming performed by plaintiff ... could not be used to produce acceptable music engraving and that it was necessary to undertake the programming work anew if an acceptable product were to be produced. Id. at 458.
Since the experts' reports were not submitted before trial, "the trial judge restricted their testimony to the net opinions set forth in the interrogatory answer." Id. at 459. Judge Furman, writing for this court, stated:
In our view, that sanction for breach of discovery rules was neither just nor reasonable under the circumstances.... The exclusions substantially impeded the jury in carry out its demanding undertaking.... To resolve the issue fairly, the jury should have had before it expert opinions on both sides to weigh and balance. 202 N.J. Super. at 459.
He further reasoned that, without an explanation, these net opinions "lacked credibility and conviction." Ibid.
Although the trial judge is given great discretion to determine the appropriate sanction for a breach of the discovery rules, see R. 4:23, "the sanction ... must be just and reasonable." Brown v. Mortimer, 100 N.J. Super. 395, 401 (App.Div. 1968). Ordinarily a court should not order sanctions if there is no "design to mislead" or surprise and there is an "absence of prejudice which would result from the admission of *172 the evidence." Westphal v. Guarino, 163 N.J. Super. 139, 146 (App.Div. 1978), aff'd o.b., 78 N.J. 308 (1978). See also Brown v. Mortimer, supra, 100 N.J. Super. at 401-402.
In the case before us, much as in Hall v. Zuckerman, supra, when the net opinion was given by the expert, the adversary would have been permitted by interrogatory and deposition to discover the basis for the expert's opinion. Evid.R. 57 provides that "a witness may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts and data, unless the court requires otherwise." Yet the rule continues: "The witness may in any event be required to disclose the underlying facts or data on cross-examination." Since this inquiry was open to plaintiff, it should not have been foreclosed to defendant on direct examination. The trial judge's limitation on Schwalje's testimony to a mere rebuttal, without foundation, of plaintiff's expert's report was substantially worthless and lacked credibility and conviction; it required "factual underpinning." Hall v. Zuckerman, supra, 202 N.J. Super. at 459.
Since the jury here determined that the crane was defectively designed, the issue of a code violation was critical. Had the expert been permitted to testify concerning such lack of violation with specific reference to applicable codes, a verdict for defendant was not inconceivable. Although defendant should have provided a supplemental and more detailed report, plaintiff had no right to eschew discovery and then object to the admission of the materials that were fairly obtainable through interrogatories or depositions, and which logically flowed from the expert report already provided. We determine that this error was "clearly capable of producing an unjust result," R. 2:10-2. We consequently must reverse the judgment and remand this matter for a new trial, notwithstanding the considerable time and expense already invested by the parties in this case.
*173 Since the error that we perceive involved only the liability issue, we see no necessity to retry the damage question; the issues are fairly severable. Cf. R. 4:38-2(b). The damage judgment shall be preserved and reinstated if defendant's liability is again determined after retrial. Navarro v. George Koch & Son, 211 N.J. Super. 558, 583 (App.Div. 1986).
The judgment appealed from is reversed and the matter is remanded to Law Division for further proceedings in accordance with this opinion.
NOTES
[1] The wheels of the crane were separated by almost the entire width of the building, approximately 60 feet. The building itself was more than 300 feet long and approximately 100 feet high. The ends of the building were open. The crane, operated from a cab, moved along tracks in a north and south direction, and had internal trolleys that permitted the crane to be moved between the east and west wall. It thus could be positioned over any portion of the building. The crane itself was elevated approximately 22 feet above the floor.
[2] No claim was made based upon the servicing of May 21, 1970 or March 31, 1981, or any independent failure to warn of the danger of the alleged design defects which were or should have been noted on those dates.
[3] And see the most recent amendment of the statute by L. 1986, c. 117 by which the definition of personal property and real property were incorporated in N.J.S.A. 54:4-1, and the standards of City of Bayonne were adopted.
[4] Specifically, the Secured Financing section of the Uniform Commercial Code, N.J.S.A. 12A:9-313, was discussed in detail as allegedly forming the basis of the demise of the institutional doctrine. 79 N.J. at 376-377. A history of Section 9-313 of the Uniform Commercial Code, however, suggests that no such effect was intended. See the Uniform Commercial Code and the Law of Fixtures, 86 N.J.L.J. 61 (1963). The 1972 amendments proposed by the Uniform Laws Commissioners were adopted in New Jersey effective December 1, 1981, see N.J.S.A. 12A:9-313, amended by L. 1981, c. 138 § 23, but still left the definition of "fixtures" to local real estate law. The Uniform Commercial Code 1972 official comment number 2, however, merely include within the definition of fixtures "goods integrally incorporated into the real estate...." Comment 3 notes that there are three categories of goods: pure chattels which retain their character, ordinary building materials which cannot retain their chattel character; and an intermediate class which has become real estate for certain purposes, but as to which chattel financing may be preserved. These comments are also explanatory of the terms used in the predecessor sections N.J.S.A. 12A:9-313(1) and (5), relied upon by the Supreme Court in City of Bayonne.
[5] See also Wayne Tp. Bd. of Education v. Strand Century, Inc., 172 N.J. Super. 296 (App.Div. 1980), applying the statute of repose to a three to four ton dimmer unit included within the lighting system for an auditorium. It was there assumed that "the dimmer panel was an integral part of the permanent electrical system of the auditorium and was `required for the structure to actually function as intended'." 172 N.J. Super. at 300, citing Brown. Unfortunately, the Wayne Tp. case, decided shortly after City of Bayonne, did not note the abolition of the institutional doctrine.
[6] This statute had been enacted prior to the decision in City of Bayonne, but did not apply to the assessment there under review.