839 A.2d 993 (2003)
365 N.J. Super. 601
Mary FERRANTE, Plaintiff,
v.
Thomas J. SCIARETTA, in his individual and official capacities, the Borough of Bernardsville, a municipal corporation, and the Bernardsville Police Department, Defendants.
Superior Court of New Jersey, Law Division.
Decided August 14, 2003.
Lisa Manshel, Millburn, for plaintiff (Francis & Manshel).
*994 Dennis A. Cipriano, West Orange, for defendant Thomas J. Sciaretta.
Timothy Beck for defendants The Borough of Bernardsville and The Bernardsville Police Department (Bateman, Coley, Yospin, Kunzman, Davis & Lehrer).
BERNHARD, J.S.C.
This is plaintiff's post-judgment motion seeking a ruling to reflect the negative tax consequences of a lump sum award of economic damages. The application for this relief presents a question of first impression in New Jersey. Whether adverse tax consequences to a successful plaintiff in a discrimination case constitute "such damages" under N.J.S.A. 10:5-3 has not been decided by courts of New Jersey.
After a six week trial the jury returned a verdict in favor of plaintiff, Mary Ferrante, affirming that she was the victim of sexual harassment by Thomas Sciaretta, the former Police Chief of the Borough of Bernardsville, while she was an employee of that municipality's police department. The jury determined that the Borough of Bernardsville failed to take reasonable steps to prevent the sexual harassment. The jury also found the actions of Chief Sciaretta and the Borough of Bernardsville created a sexually hostile work environment and resulted in a constructive discharge of the plaintiff. It was also determined that the plaintiff was deprived of her rights to exercise free speech by the defendants.
The plaintiff recovered economic damages in the amount of $340,659, which included an award of back pay and front pay. She also received $26,250 in damages for emotional distress and suffering. Pre-judgment interest in the amount of $72,298.16 and $895,025.77 for counsel fees and disbursements were awarded.
To decide this issue, it is necessary to first examine the statutory framework of New Jersey's Laws Against Discrimination. N.J.S.A. 10:5-13 states in pertinent part:
... All remedies available in common tort actions shall be available to a prevailing plaintiff. These remedies are in addition to any provided by this Act or any other statute.
And also N.J.S.A. 10:5-3 states:
The Legislature finds and declares the practice of discrimination against any of its inhabitants because of ... sex ... are matters of concern to the Government of the state and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the state but menaces the institution and foundations of a free democratic state...
The Legislature further declares its opposition to such practice of discrimination when directed against any person by reason of ... sex ... in order that economic prosperity and general welfare of the inhabitants of the state may be protected and insured.
The Legislature further finds that because of discrimination people suffer personal hardships and the state suffers grievous harm. Personal hardships include economic loss, time loss, physical and emotional stress...
Such harms have under the common law given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and this act shall be liberally construed in combination with other protections available under the laws. (Emphasis added.)
The Supreme Court in Fuchilla v. Layman, 109 N.J. 319, 324, 537 A.2d 652 (1988) stated:
*995 ... the clear public policy of this state is to abolish discrimination in the work place. Indeed, the over arching goal of the law is nothing less than the eradication `of the cancer of discrimination.' Jackson v. Concord, 54 N.J. 113, 124, 253 A.2d 793 (1969).... The public interest in making a discrimination free work place infuses the inquiry. David v. Vesta Co., 45 N.J. 301, 327, 212 A.2d 345 (1965).
The nature of compensatory damages in discrimination cases ... include money damages awarded to a plaintiff `by way of compensation to make up for some loss that was not, originally, a money loss but one that ordinarily would be measured in money.' Dan B. Dobbs, Remedies, "Principles of Damages," (Section 3 at 135, 3rd Ed.1973). In an employment discrimination case such damages include back pay provided `to make the discriminatee whole by reimbursement of economic loss suffered' and front pay to compensate the employee for future lost wages attributable to the employer's misconduct. Baker v. National State Bank, 353 N.J.Super. 145, 158, 801 A.2d 1158 (App.Div.2002).
The statutory goal is to end discrimination; the victims want a discrimination-free work environment, not lawsuits. But when unlawful discrimination does occur, the secondary fallback purpose is to compensate the victims for their injuries. In other words "to make the victims of unlawful discrimination whole by restoring them, so far as possible ... to a position where they would have been were it not for the unlawful discrimination." (Emphasis added). Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 230, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982).
The term "such damages" in N.J.S.A. 10:5-13 refers to compensatory damages in the preceding sentence. Black's Law Dictionary defines actual damages as "the amount awarded to a complainant in compensation for his actual and real loss ... synonymous with compensatory damages..." Compensatory damages are defined in part as "... such as will simply make good or replace the loss caused by the wrong or injury.... The rationale behind compensatory damages is to restore the injured party to the position he or she was in prior to the injury." Black's Law Dictionary, pp. 390 (6th Ed.1990).
The thrust of compensatory damages, as well as the underlying philosophy of the New Jersey anti-discrimination laws, make it clear that the statute should not only be liberally construed but broadly applied. In O'Neill v. Sears, Roebuck & Company, 108 F.Supp.2d 443 (E.D.Pa.2000), the court noted that front pay money has already been reduced to present value on the assumption that the plaintiff can invest the money and receive a return equivalent to the lost income. The court concluded that if the plaintiff must pay a higher tax on the present value of his earnings, then this leaves less for investment. Thus "the plaintiff will not, in fact, realize an investment gain large enough to equal the future wages [she] is not getting as a result of defendant's discriminatory conduct." The court referred to a television advertisement which stated "It's not how much money you make, it's how much money you keep," and expressed that it was the statutory goal to allow the plaintiff to keep the same amount of money as if he had not been unlawfully terminated, and decided that this goal requires reimbursement for the reduced amount of front pay money that the plaintiff has to invest as a result of higher taxes, as well reimbursement for higher taxes he must pay on his back wages caused by getting his money in a lump sum. O'Neill, supra 447.
The Washington Court of Appeals also considered this issue in Blaney v. Int'l *996 Assoc'n. of Machinists and Aerospace Workers, 114 Wash.App. 80, 55 P.3d 1208 (2002). To avoid the adverse tax consequences of a lump sum award the court analyzed the broad scope of that state's statutory term, "actual damages" as well as the state's legislative policy to "deter and eradicate discrimination" and to make the matter a public policy of the "highest priority." The policy of construing the anti discrimination statute liberally to effect its purpose, and the grant of this type of relief in other federal cases, construing similar discrimination laws, O'Neill, supra and Sears v. Atchison, Topeka & Santa Fe Ry., 749 F.2d 1451 (10th Cir.1984), all support the conclusion that adverse federal income tax consequences triggered by the payment of a judgment for a violation of the (statute) are within the scope of the term "actual damages." Blaney, supra, 55 P. 3d at 1216-17. The court also realized the practical aspect of the tax impact on such an award would be a substantial reduction of damages award. The federal income tax would undercut the award which has been identified as "a public policy of the highest priority." Blaney, supra, 55 P.3d at 1216-17. The court concluded that plaintiff would share her award with the Internal Revenue Service and not receive its full benefit, therefore, would not be made whole which is the philosophy of the statute.
The logic of O'Neill and Blaney applies equally to New Jersey Laws Against Discrimination. As pointed out, the legislature mandated in order to effectuate the policies underlying LAD, the damage provision of that statute "shall be liberally construed". N.J.S.A. 10:5-3. Therefore, under the "make whole" policies of the statute, defendants will be required to compensate plaintiff for the negative tax consequences of receiving the lump sum award.
Defendants oppose plaintiff's request for relief on procedural and evidentiary grounds. Defendants contend that there is no support for this post-trial award under our rules and that the reports on which plaintiff bases her tax loss are net opinions.
Defendants argue that Rule 4:49-1 and Rule 4:49-2 do not provide a basis for modifying plaintiff's judgment. I have determined earlier in this opinion that such relief is directly authorized under the statutory authority of New Jersey Law Against Discrimination, N.J.S.A. 10:5-3. Furthermore, Rule 4:50-1(f) does authorize a motion for relief from a judgment or order "for any other reasons justifying relief from the operation of the judgment or order." Two courts have previously ruled that negative tax consequences should be determined by the trial judge on a post-trial motion. See O'Neill v. Sears Roebuck and Co., supra and Blaney, supra, 114 Wash.App. 80, 55 P.3d 1208. The issue of negative tax consequences is not the primary relief sought by the plaintiff as a result of defendant's unlawful conduct, but is a supplemental issue similar to post-trial applications for pre-judgment interest and applications for attorney's fees and costs. It is not until after a jury returns a favorable verdict that the plaintiff becomes entitled to pre-judgment interest on the verdict. It is the same with a negative tax consequence. The plaintiff does not suffer those damages at the inception of the trial, but only after the jury awards lump sum economic damages.
The negative tax consequences of a jury award is not an issue that is readily subject to determination by a jury. This is true because the precise amount of the award is unknown until the verdict. The jury would not have the expertise to project the tax liability on their award, that is, to apply the appropriate tax rates *997 and/or the alternate minimum tax computations. These calculations require expert analysis. Therefore, post-trial application is the only viable procedural mechanism to consider this issue.
This court's May 22, 2003 Order of Judgment included the following language:
ORDERED that plaintiff's application for attorney's fees, costs and expenses, for an award to reflect the negative tax consequences of the verdict, and for pre-judgment interest shall be determined by further motion to the Court ...
Plaintiff advised the defendants that she was seeking negative tax consequences in the event she received a lump sum award for back and front pay as early as December 5, 2000 when she provided defense counsel with a copy of a report by her expert, Donald Welsch. On December 10, 2002, plaintiff again provided defendants with a revised report providing the same type of calculations and background information but revising the dollar amount for negative tax consequences. These reports included all calculations as to back pay, front pay, pension loss and for the negative tax impact. On March 3, 2003, shortly before trial, defendants were again notified that plaintiff intended to serve a revised report from Donald Welsch to apply to the actual jury award amount, if she was successful.
Donald Welsch was called by the plaintiff as an expert. Prior to his testimony both defense counsel consented to redacting the negative tax figure in Table 2 so his report and calculations could be admitted in evidence. Counsel agreed that the redacted number could only be used on a post-trial motion. This information was conveyed to the court and defendants were well aware that plaintiff was proceeding under the methodology set forth in Donald Welsch's expert report. Neither defendant objected to plaintiff proceeding on the premise that a post-trial application was appropriate. Defendants' contention that such relief could not be awarded post-verdict lack merit and furthermore, by defendants' conduct in consenting to the Order of Judgment they have waived their right to object to this procedure.
As plaintiff accurately points out, the Rules of Evidence state:
RULE 705. DISCLOSURE OF FACTS OR DATA UNDERLYING EXPERT OPINION; HYPOTHESIS NOT NECESSARY
The expert may testify in terms of opinion or inference and give reasons therefore without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination. (Emphasis added).
It is clear from this Rule and prevailing case law that when an expert report is furnished, "the expert's testimony at trial may be confined to the matters of the opinion reflected in the report." However, testimony about the predicates and conclusions set forth in the report are not foreclosed. McCalla v. Harnischfeger Corp., 215 N.J.Super. 160, 171, 521 A.2d 851 (App.Div.1987). When a net opinion is given by an expert his adversary is permitted to discover the basis of the expert's opinion by depositions or other discovery techniques. The court, in McCalla supra, concluded that a party cannot "eschew discovery and then object to the admission of the materials that were fairly attainable through ... depositions which logically flowed from the expert report already provided." McCalla, supra. 172
Defendants had Donald Welsch's calculations as early as December 5, 2000, and his revised calculations on December 10, 2000. The report provided to defendants *998 on April 30, 2003, after the jury verdict, was not a previously undisclosed report but rather a revised report showing the precise calculations based upon the jury award, which, of course, was an amount different than used in Donald Welsch's pre-trial projections. Furthermore, defendants had plaintiff Mary Ferrante's tax returns from 1993 to 2001. The only additional information was her tax return for 2002 which was not available until after the trial was concluded in April. As plaintiff points out in her brief, defendants never sought or conducted the deposition of Donald Welsch, defendants never asserted any deficiencies in plaintiff's interrogatory answers or document production of Donald Welsch's earlier reports, opinions and supporting documents. Nor did defendants ever identify a rebuttal expert on economic damages or negative tax consequences.
As a result, this court concludes that defendants have no standing to assert a net opinion objection to Donald Welsch's conclusion that plaintiff's negative tax impact as the result of the jury award was $107,000. The Order of Judgment of May 22, 2003 will be modified to award this sum.
In addition, plaintiff's counsel will be awarded counsel fees for this additional application and hearing in the amount of $5,223, which represents 17.41 hours of additional work resulting from defendant's impermissible late objection to her original application and second hearing. She will also be awarded $146 in disbursements.
I direct Ms. Manshel to prepare the appropriate order. *999-1005 [Editor's Note:]