**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 19 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JASON DURHAM,

Plaintiff-Appellant,

v.

No. 03-6157

HERBERT OLBRICH GMBH & CO.
KG, a German entity,

Defendant-Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CV-02-441-H)**

Micky Walsh, Beeler, Walsh & Walsh, Oklahoma City, Oklahoma, and Joe E.
White, Jr. and Charles C. Weddle III, White Law Firm, P.C., Oklahoma City,
Oklahoma, for Plaintiff-Appellant.

Derrick Teague and Rodney L. Cook, Jennings Cook & Hoisington, Oklahoma
City, Oklahoma, for Defendant-Appellee.

Before **LUCERO** , **McKAY** , and **TYMKOVICH** , Circuit Judges.

**TYMKOVICH** , Circuit Judge.

While performing his job for Armstrong World Industries at Armstrong's

vinyl flooring manufacturing plant in Stillwater, Oklahoma, plaintiff-appellant

Jason Durham was severely burned after becoming entangled in linoleum webbing being drawn onto a hot oil drum. Although Durham's accident occurred in 2001, the plant equipment had been installed in 1987. The district court granted summary judgment on Mr. Durham's products liability claims in favor of defendant Herbert Olbrich GMBH & Co., the manufacturer of the base coating production line that included the hot oil drum. The court held, as a matter of law, that the base coating line is "an improvement to real property," thus qualifying Olbrich for protection under Oklahoma's ten-year statute of repose that limits liability for persons or entities involved in the design or construction of improvements to real property. Aplt. Br. Ex. B at 5, 7; *see* 12 Okla. Stat. § 109. Because we conclude that the district court erred in holding that Olbrich is entitled to protection from liability under section 109, we reverse. [1]

## I. Standard of Review

We review the district court's order granting summary judgment
under the same standard employed by the district court under
Rule 56(c) of the Federal Rules of Civil Procedure. Summary
judgment is proper only if there is no genuine issue of material fact
for determination, and the moving party is entitled to judgment as a
matter of law. . . . We review the entire record on summary

---

[1] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

judgment *de novo* in the light most favorable to the party opposing
summary judgment.

*Riley v. Brown & Root, Inc.*, 896 F.2d 474, 476 (10th Cir. 1990) (citations

omitted).  Since the precise issue in this case has never been squarely resolved in

Oklahoma, our task is to  predict how the Oklahoma Supreme Court would answer

the question.  *See Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1382

(10th Cir. 1989).  In doing so, we review the district court's interpretation and

application of section 109  *de novo.  See id.*

## II.  Relevant facts

In 1987 Armstrong purchased a manufacturing plant that had been used for

producing rubber products.  The production machinery installed by the previous

owner was removed because it did not suit Armstrong's purposes.  In addition,

because the floor slabs inside the plant had heaved and become uneven,

Armstrong tore out the slabs, hired an architect, and designed and installed a new

foundation to meet its needs for the vinyl flooring production line it had custom-

ordered from defendant Olbrich.  This design and construction is not at issue in

this case.

Olbrich designed its production line to fit inside Armstrong's existing

building.  The base coating component of the line that contains the hot oil drum is

over twenty feet wide, twenty feet high, and 200 feet long when installed.  Each

major component of the line was assembled and tested in Germany at Olbrich's manufacturing plant, and then disassembled and transported to Oklahoma. In 1988 Armstrong hired a contractor to install the line inside its plant. The assembly contractor worked with, and under the supervision of, Olbrich employees.

Although the machinery in the base coating line is bolted to the floor slabs so that all components maintain precise alignment, none of the machinery is attached to the walls or roof of the building itself, and each piece of equipment is designed to be totally self-supporting. Aplt. App. III at 53, 62, 81. The line can be "dismantled and removed from the Armstrong facility and moved to any other suitable site or building," leaving the building intact and usable for "any purpose deemed appropriate once the base coating line [i]s removed." *Id.* at 121. The base coating line machinery in Armstrong's plant, although unique in the width of flooring it produces, is similar to other machinery Olbrich designs, manufactures, and assembles in its business of manufacturing base coating equipment.

It is undisputed that Armstrong treats the base coating line machinery as its personal property under Oklahoma law. As such, the State of Oklahoma taxes the machinery as personalty, and not as realty, under its ad valorem taxing scheme.

In 2001, Mr. Durham was cleaning the hot oil drum as part of its continual maintenance requirements when his arm became caught in the linoleum web being

pulled around the drum for curing.  He was pressed against the 300-degree surface of the drum for fifteen minutes because he could not reach the emergency shut-off switch and the machinery had no mechanism for automatic shut-off and release.  Mr. Durham's expert opined that the accident could have been prevented with inexpensive design modifications available since the early 1970s, and that the machine was defective at the time it left the manufacturer.  *Id.* at 31.  But because the machinery had been installed in Armstrong's plant for more than ten years before the accident, the district court granted summary judgment to Olbrich under section 109.

## III.  Discussion

The central question on appeal is whether, after ten years from the date manufacturing machinery is installed in a building, the machinery's manufacturer may totally escape liability for that product's alleged defects solely because it designed and assisted in reassembling and installing the injury-causing equipment.  We determine whether Olbrich falls under section 109's protection by examining section 109's language and purpose as interpreted by applicable

Oklahoma case precedent. [2]

### A. Statutory language

Section 109 provides:

> No action in tort to recover damages
> (i) for any deficiency in the *design, planning, supervision or observation of construction or construction of an improvement to real property*,
> (ii) for injury to property, real or personal, arising out of any such deficiency, or
> (iii) for injury to the person or for wrongful death arising out of any such deficiency,
> shall be brought against any person owning, leasing, or in possession of such an improvement or performing or furnishing the design, planning, supervision or observation of construction or construction of such an improvement more than ten (10) years after substantial completion of such an improvement.

Okla. Stat. Ann. tit. 12, § 109 (emphasis added). Oklahoma follows the rule of construction that "[t]he plain meaning of statutory language is conclusive except in the rare case in which literal construction will produce a result demonstrably at odds with the intention of the Legislature." *Bishop v. Takata Corp.*, 12 P.3d 459, 465–66 & n.30 (Okla. 2000). "[W]e must assume that the law-making body intended a common word to be interpreted in its ordinary and usual parlance." *Reynolds v. Porter*, 760 P.2d 816, 821 (Okla. 1988). Thus, by its plain language,

---

[2] The core facts as stated in Section II, *supra*, are undisputed. The question of whether the undisputed facts bring this case within section 109's protection is a legal matter for the court. *See Gorton v. Mashburn*, 995 P.2d 1114, 1117–18 (Okla. 1999). The matter is therefore appropriately disposed of by summary judgment. *Id.*

section 109 protects only those involved in designing, planning, supervising, or conducting *construction* of an *improvement to real property*.

Olbrich contended, and the district court agreed, that Oklahoma law does not clearly define what constitutes "an improvement to real property" under section 109. *See* Aplt. App. I, at 27. Olbrich asserts that the machinery is a "fixture" that is an "improvement to real property" in Oklahoma. The court quoted a broad definition of "improvement to real property" that includes any addition to real property, whether permanent or not, that increases a property's value or utility or enhances its appearance. *See id.* (quoting B LACK'S LAW DICTIONARY at 761 (7th ed. 1999)). Under this reading of the definition, therefore, any product that increases a piece of real property's utility is "an improvement to real property," and the designer or manufacturer of that product would theoretically be protected from liability under section 109.

But the Oklahoma Supreme Court has given specific guidance on what constitutes an "improvement to real property" under section 109, and has rejected applying such a broad reading of the statute.

**B. Oklahoma Precedent**

The seminal Oklahoma case guiding our analysis is *Smith v. Westinghouse Electric Corp*., 732 P.2d 466, 469 (Okla. 1987). In *Smith*, the Oklahoma Supreme Court considered whether an electrical transformer constituted an "improvement

-7-

to real property" within the meaning of section 109. The Public Service Company of Oklahoma had purchased the electrical transformer from the defendant-manufacturer, and then housed it in a vault beneath a building in Tulsa, Oklahoma. When the transformer exploded a short time later, several plaintiffs brought an action against the manufacturers of the transformer and its component parts. The defendants argued that they were shielded by section 109 because the transformer, which was more than ten years old at the time of the explosion, constituted an improvement to real property, and the trial court agreed. *Id.* at 468.

The Oklahoma Supreme Court reversed, however. In finding that section 109 did not shield the defendants from suit, the Court held that the preliminary test for determining whether machinery or equipment is "an improvement to real property" for purposes of section 109 protection is "derived from [Oklahoma's ad valorem] taxing scheme." *Id.* at 470. Because the transformer at issue had always been taxed as personalty, and not as real property, it "retain[ed] at all times its character as the personalty of the public utility supplying the electrical power" and thus was not an "improvement to real property." *Id*. at 468. In addition, it was significant to the Court's analysis that the electrical transformer had neither been purchased nor owned by the proprietor of the building where the injury occurred. *Id.* at 469.

The district court in this case interpreted *Smith* to focus its tax analysis only on the ownership aspect of the transformer, and not on whether the transformer was taxed as personalty or realty, citing *O'Dell v. Lamb-Grays Harbor Co.*, 911 F. Supp. 490, 493 (W.D. Okla. 1995). *See* Aplt. App. Vol. I at 28 n.5. But we feel compelled to give meaning to *Smith's* statement that the transformer was not an improvement to real property, at least in part, because it retained its character as personalty, having always been taxed as personalty. [3] *See Smith*, 732 P.2d at 467–68. Thus, as we understand *Smith*, the question of whether a particular item is an improvement to real property depends on its ad valorem tax treatment *and* its ownership. *See Riley v. Brown & Root, Inc*., 896 F.2d 474 (10th Cir. 1990) (applying Oklahoma law, remanding case for record development regarding tax treatment and ownership); *Branch v. Mobil Oil Corp*., 788 F. Supp. 531, 537 (W.D. Okla. 1991) ("In Oklahoma, the question of whether structures . . . are 'improvements to real property' turns on who owns the structures and ad valorem tax treatment.") (citing *Smith*, 732 P.2d at 468–70)).

---

[3] *Williams v. Harrop Indus., Inc*., 73 P.3d 902 (Okla. Ct. App. 2003), supports our holding that *Smith* directs an examination of the item's tax treatment. In *Williams*, the court stated, "Although we are not presently convinced that *Smith* holds the ad valorem tax treatment of the equipment is controlling on this issue, any analysis *must*, at the very least, include consideration of the ad valorem tax treatment of the equipment." *Id.* at 904.

Our analysis of *Smith* is not at an end, however. In reaching the conclusion that the electrical transformer was not an improvement to real property, *Smith* discussed the case of *Mullis v. Southern Co. Services., Inc*., 296 S.E.2d 579 (Ga. 1982). There, the Georgia Supreme Court applied a three-prong test for assessing what constitutes an improvement to real property; namely, (1) the permanence of the improvement, (2) the degree to which the improvement enhances the value of the realty, and (3) the intention of the parties to make the improvement one to the realty.[4] *Id.* Although *Smith* did not adopt these factors or apply them to the facts before it, nor did it foreclose their use. In fact, *Smith* gives tacit approval to these factors in factual circumstances similar to the case at bar: "While this may be a correct conceptual approach when the injury for which recovery is sought occurs on the public utility's property, it is not persuasive where, as here, the harm is dealt by an instrumentality located on property *serviced* by the public utility." *Id.* at 469; *see also O'Dell*, 911 F. Supp. at 494 (applying *Mullis's* three-part test).

Thus, in predicting how the Oklahoma Supreme Court would answer the question before us, we conclude that it would look to the machinery's ad valorem tax status, whether the machinery was taxed as the personal property of somebody

---

[4] These factors are a variant of the "commonsense approach" to what constitutes an improvement to real property, which is followed by a majority of jurisdictions. William D. Bremer, *What Constitutes "Improvements to Real Property" for Purposes of Statute of Repose or Statute of Limitations*, 122 A.L.R. 5th 1, at *2a (2005).

other than the owner of the real property where the accident occurred, and the factors identified in *Mullis*.[5] This articulation, in our view, recognizes the weight given by Oklahoma courts to a particular item's tax and ownership status, while at the same time acknowledging that other factors such as permanence, enhanced value to the realty, and the intent of the parties can aid the court in making its decision with respect to the applicability of section 109.

### C. The purpose of section 109

In applying the factors articulated by Oklahoma case law, we must be careful not to divorce the analysis from the statute's purpose. As noted above, the plain language of section 109 protects those involved in designing, planning, supervising, or conducting the construction of an improvement to real property. By its terms, then, this section does not to apply to manufacturers such as Olbrich. However, as discussed below, Oklahoma courts have extended section 109 protection to manufacturers in limited circumstances.

In a case decided in 1989 the Oklahoma Supreme Court discussed the purpose of section 109. It held that section 109 is "related to the legitimate government objectives of providing for a measure of security for *building professionals* whose liability could otherwise extend indefinitely" and "of

---

[5] Although Oklahoma appears to be in a minority of jurisdictions that look to an item's tax treatment, it is not the only state that does so. *See McCalla v. Harnischfeger Corp.*, 521 A.2d 851 (N.J. Super. Ct. App. Div. 1987).

-11-

avoiding the difficulties in proof which arise from the passage of time." *St. Paul Fire & Marine Ins. Co. v. Getty Oil Co.*, 782 P.2d 915, 921 (Okla. 1989) (emphasis added). The court noted that architects, contractors, and owners and lessees of improvements to real property are included in section 109's protection from liability, but did not pass on whether manufacturers fall within its parameters. *See id.* at 922 & n.6. The court concluded that the ten-year period struck a "reasonable balance between the public's right to a remedy and the need to place an outer limit on the tort liability of those *involved in construction.* " *Id.* at 923 (emphasis added) (quotation omitted).

In a case ten years later, the Oklahoma Supreme Court again discussed the purpose of section 109: "Section 109 evinces in clear language legislative intent that persons who own, lease or possess *property* which has been *structurally enhanced* not be liable for design and construction defects *in the built improvement* more than ten years after 'substantial completion' of the same." *Gorton v. Mashburn*, 995 P.2d 1114, 1116 (Okla. 1999) (emphasis added). And the Oklahoma Supreme Court has stated in dicta that, under section 109, "the [Oklahoma] Legislature has given [individuals] a 'wrong' against the builder for injuries sustained only in the first ten years of a *building's construction*." *Rollings v. Thermodyne Indus.,* 910 P.2d 1030, 1036 (Okla. 1996) (emphasis added).

In 1994, the Oklahoma Supreme Court decided the question of whether section 109's protection can extend to those, like Olbrich, involved in manufacturing equipment. Specifically, a federal district court certified the following question: whether section 109's protection against liability applied to a manufacturer who designed a product, which, upon installation, became an improvement to real property. *Ball v. Harnischfeger Corp.*, 877 P.2d 45, 45 (Okla. 1994). The Court assumed, however, for purposes of answering the certified question, that the item in question (a large crane and trolley system that had been permanently installed as part of the construction of a port terminal) was an improvement to real property. *Id.* at 46.

In seeking to balance Oklahoma's law of products liability with its statute of repose protecting those who perform construction activities on improvements to real property, the Court held that "mere manufacturer[s are] not protected by our Section 109." *Id.* at 50. However, the title "manufacturer" does not, by itself, automatically preclude protection. Instead, the Court followed a majority of jurisdictions in holding that courts must look to the *activity* performed by the manufacturer. *Id.* "If the manufacturer was acting as a designer, planner, construction supervisor or observer, or constructor, the statute of repose will apply. It is the specialized expertise and rendition of particularized design which separates those protected from mere manufacturers and suppliers." *Id.*

-13-

Furthermore, because products liability law will apply to manufacturers in most circumstances, situations in which manufacturers qualify for protection under section 109 "will only occur in a narrow line of cases." *Id.*

In reaching its holding, the Court contrasted manufactured goods that are pre-fabricated and mass-produced, which are not covered by section 109, with goods that are "unique in design" and manufactured to fit the "unique specifications" of a location. *Id.* at 48–49. In addition to an item's uniqueness, the Court cited cases finding manufacturer protection in situations in which a crane was designed to "fit a particular need in the *construction* of a building," *id.* at 49 (emphasis added), and a conveyor belt "was an integral part of the building" and was "*integrated into the construction* of the new power plant." *Id.* (emphasis added). The Court contrasted these cases with one in which the manufacturer was not protected by a statute of repose—even though the harm-causing electrical dimmer panel in that case "was an integral part of the permanent electrical system of a building"—because the panel manufacturer was not involved in the actual construction of the building. *Id.* The *Ball* Court noted that "[p]roduct design was not enough to trigger the statute; the manufacturer must be involved in the designing or construction of the improvement to real estate, or of an integral component part of the improvement." *Id.*

In sum, section 109 was not intended to cover the broad spectrum of manufacturers who normally would be subject to the limitations statutes applicable in products liability cases. *See Ball* , 877 P.2d at 50. Application of section 109 by the Oklahoma state courts has thus far been limited to persons or entities involved either in the construction industry (including manufacturers who also perform the task of constructing what becomes an improvement to real property or its integral parts), or to owners of the real property that contains the harm-causing improvement. [6] With this background in mind, we now turn to the particular facts of this case.

_____

[6] A review of Oklahoma state case law shows that improvements to real property as defined in section 109 have included in-ground swimming pools, *see Morin v. Coral Swimming Pool Supply Co.*, 867 P.2d 494 (Okla. Ct. App. 1993) (protecting builder); elevators, *see Mooney v. YMCA of Greater Tulsa*, 849 P.2d 414, 416 (Okla. 1993) (protecting elevator manufacturer against claims of negligent installation, but not for negligent maintenance, of elevator); stationary cranes and their platforms that are themselves permanently attached to the land, *see Ball*, 877 P.2d at 46 (protecting manufacturer who constructed whole crane system that created port terminal on real property); a metal service pipe containing a building's electrical service, *see Juvenal ex rel. Juvenal v. Okeene Pub. Sch.*, 878 P.2d 1026, 1029 (Okla. 1994) (protecting school against design defects), *superceded by statute on other grounds as stated in Minie v. Hudson*, 934 P.2d 1082 (Okla. 1997); retaining walls, *see Lincoln Bank & Trust Co. v. Neustadt*, 917 P.2d 1005, 1007–09 (Okla. Ct. App. 1996) (protecting owner of wall attached to land); bridges that provide egress for an office building, *see Gorton v. Mashburn*, 995 P.2d 1114, 1115 (Okla. 1999) (protecting landlord); and floors inside a building, *see Abbott v. Wells*, 11 P.3d 1247, 1248–49 (Okla. 2000) (barring claim for deficiency in design or construction of raised floor against owner under section 109, but holding claim for negligence for failure to warn of danger that floor was raised was not barred).

**D. Application to this case**

Applying the methodology outlined in *Smith*, we look first to the item's tax treatment. It is undisputed that the production-line machinery at issue here is taxed as personalty under Oklahoma's ad valorem taxing scheme.[7] Aplt. App. III, at 15. This factor, of course, suggests that the production-line machinery is merely personalty, not an improvement to real property. While it is not dispositive, we weigh this factor more heavily given the emphasis Oklahoma courts place on an item's tax treatment.

The second factor is ownership. Armstrong owns both the production-line machinery and the realty where the injury occurred. This is not, therefore, a situation like *Smith* where the harm-causing instrumentality was located on the property of someone other than the owner of the real property.

The next factor is permanence of the improvement. The record reflects that the production-line machinery is bolted to the floor of the Armstrong facility. Aplt. App. II, at 9. This fact, in connection with the machinery's gargantuan size (it weighs between 60 to 80 tons and is approximately 20 feet wide, 20 feet high, and 200 feet long), suggests that the production-line machinery is a permanent

---

[7] Oklahoma's ad valorem taxing statutes are found in title 68. "Real property" includes "the land itself, and all rights and privileges thereto belonging . . . and all buildings, structures and improvements or other fixtures . . . exclusive of such machinery and fixtures on the same as are, for purposes of ad valorem taxation, defined as personal property." Okla. Stat. tit. 68, § 2807(8).

improvement. However, it is undisputed that the machinery can be dismantled and removed from the building without causing harm to the machinery or the Armstrong facility. *Id.* at 121. The machinery is not welded to the floor and is essentially free-standing; in fact, Armstrong's specifications regarding the machinery mandated that "no equipment may be connected to the building structure." *Id.* III, at 8. Once the machinery is dismantled and removed, the Armstrong facility could be used for any other suitable purpose. In these circumstances, we conclude that the permanence factor weighs in favor of a finding that the production-line machinery is not an improvement to real property.

We next consider the degree to which the production-line machinery enhances the value of the realty. Although the production-line machinery itself has great value, its value is separate from the value of the realty where it is located. To illustrate, the machinery here is different from, say, an elevator. By removing an elevator from its shaft, the value of the realty itself suffers. In contrast, if the production-line machinery were dismantled and removed, the Armstrong facility's usefulness as an industrial building would not be diminished. This factor, therefore, similarly weighs in favor of a finding that the production-line machinery is personalty.

Finally, we find that the record on appeal is silent as to whether the parties intended the production-line machinery to be an improvement to the realty.

Although, as the district court noted, Armstrong has not indicated a present intent to remove the machinery from its factory, this fact does not speak to Armstrong's intentions when it purchased the machinery from Olbrich. Indeed, a reasonable supposition may be that Armstrong wanted a free-standing, portable production line that it could take with it in the event it moved to a new facility. In any event, given the lack of record evidence, we decline to weight this factor in either direction.

Taking all of these factors together, we conclude that the production-line machinery is not an "improvement to real property" under section 109, and the district court erred in holding otherwise. Admittedly this is a close case, and we must place emphasis on the fact that the machinery is taxed as personalty. But we are compelled to do so based on our reading of Oklahoma case law.

Furthermore, our holding is consistent with the Oklahoma Supreme Court's statements regarding the purpose of section 109. Olbrich, as the manufacturer who designed, supplied, and installed the allegedly defective product, and who did not construct Armstrong's building, was in the best position to assure the safety of its product. [8] Our conclusion is also consistent with *Ball's* statement that

---

[8] Oklahoma has determined that manufacturers are in the best situation to afford "constant protection" against injuries that may occur only intermittently or haphazardly from defective products. *Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1362 (Okla. 1974).

-18-

manufacturers fall under section 109's protection only in a narrow category of cases: those in which the manufacturer actually designs or constructs the building project itself or an integral part of that building. *See Ball*, 877 P.2d at 50; *and see Dziewiecki v. Bakula*, 824 A.2d 241, 245–46 (N.J. Super. Ct. App. Div. 2003) (holding that similar statute of repose applies "only to the party constructing or erecting an improvement to real property and only with respect to work on the improvement itself;" that products themselves are not improvements to real property; and that, therefore, a swimming-pool kit manufacturer was not protected by the statute of repose, but the construction company that installed the kit into the ground so that it became a permanent improvement to real property was protected), *aff'd*, 853 A.2d 234 (N.J. 2004). And our conclusion is consistent with products liability precedent setting limitations periods for claims against manufacturers. Clearly, Olbrich is not, and was not acting as, a "building professional" involved in the plant's construction. *St. Paul Fire,* 782 P.2d at 921. Instead, it is a machinery manufacturer involved only in designing, manufacturing, supplying, and installing manufacturing equipment that was not integral to the function of the building itself.

Finally, notwithstanding this authority, Olbrich steadfastly argues that the production-line machinery is, in fact, an integral part of the building and thus qualifies as an improvement to real property under *Ball*. *See Ball*, 877 P.2d at 50.

-19-

Again, we disagree. The term "integral" is defined as "of, relating to, or serving to form a whole: essential to completeness." *Cooperman v. David*, 214 F.3d 1162, 1166 (10th Cir. 2000) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1173 (1986)). Unlike floors, electrical systems, or elevators that are built into the structure of a building and are essential for use in making the building itself serviceable, the specific manufacturing equipment in this case is not essential and does not benefit the building, but rather benefits only the particular business conducted in the building. As demonstrated by the facts of this case, that business may change as different owners purchase the building and remove or add various pieces of machinery. Armstrong's plant was functional and "complete" for whatever use Armstrong chose to put it to before the manufacturing equipment was installed; therefore, that equipment was not "integral" to the building.

## IV. Conclusion

We are persuaded that the Oklahoma Supreme Court would not extend section 109 protection to Olbrich under the circumstances of this case. Summary judgment in Olbrich's favor was therefore improper. The judgment of the district court is REVERSED.